Marguerite Scott, et al., Plaintiffs-Appellees, v. City of Springfield, Illinois, a Municipal Corporation, Defendant-Appellant.

Gen. No. 10,798.

Fourth District.

April 27, 1967.

Walter L. Oblinger, Corporation Counsel of the City of Springfield, of Springfield (W. J. Simhauser, Assistant City Attorney of the City of Springfield, of counsel), for appellant.

Robert F. Scott and Charles G. Tisckos, of Springfield, for appellees.

TRAPP, J.

The City of Springfield, defendant, appeals from an injunction obtained by Marguerite Scott, Ralph W. Kettelkamp, Vivienne M. Kettelkamp, Freda E. Jagla and Althea M. Jagla, plaintiffs, restraining the defendant from enforcing the residential classification regulations of the city zoning ordinance against the property of the plaintiffs.

Although the decree does not specify the particular nonresidential use sought, it is clear that the case was

32

tried upon the theory that enforcement of the ordinance to prevent erection of a gasoline filling station upon the plaintiffs' property constituted arbitrary governmental action in violation of plaintiffs' constitutional rights. It is also clear that no attack was made upon the ordinance as such, but rather upon the application of the regulations to plaintiffs' property.

The case was first referred to the Master in Chancery, who made specific findings and recommendations which were approved and followed by the Circuit Court.

██ The necessary consideration of the facts and circumstances of the case requires a particular description of the neighborhood involved at the present time. Not less important, as an analysis of the cases will demonstrate, is the recorded historical trend. All of the authorities grant to the municipal council great latitude in the enactment and enforcement of zoning regulations, and it has been repeatedly stated that if the net result of the conflicting testimony is that the reasonableness of the regulation is debatable, the action of the municipal council must be sustained. Miller Bros. Lumber Co. v. City of Chicago, 414 Ill 162, 111 NE2d 149. Nevertheless, the action of the municipal council must not be arbitrary, that is, without reason, and in consequence thereof, it must appear to be following some consistent plan or theory which is demonstrably related to the existing fact situation.

 In the present case this court must be guided by another consideration which is that where there is evidence to support the findings of the trial court as to specific issues, those findings should be sustained, unless they are against the manifest weight of the evidence. The reasonableness of the classification at issue must be determined from the facts in each case. Hartung v. Village of Skokie, 22 Ill2d 485, 177 NE2d 328.

The subject property consists of three lots having a total frontage of 120 feet on South Sixth Street and a frontage of 152 feet on East Myrtle Street. The lots are improved with residences facing Sixth Street, and the property is located at the southeast corner of the intersection of Sixth Street and Myrtle Street.

The testimony and exhibits are devoted chiefly to an area bounded by Fourth Street on the west, Ninth Street on the east, a railroad viaduct across Sixth Street, which is about five blocks south of Myrtle Street and South Grand Avenue, an east and west street which is five blocks north of the subject property.

The residential character of the area was established by a zoning classification made in 1924, the outstanding exception to which was a transportation company garage and service area at the southeast corner of Sixth and Ash Streets, which is two blocks south of the subject property.

There is testimony that there has been no new residential development in the past ten to fifteen years. This would appear to be an understatement so far as the neighborhood in the immediate area of the surrounding property is concerned. Plaintiffs' photographic exhibits 1, 2, 3, 4 and defendant's photographic exhibits 1, 2, 3, 4, 5, 6, 7, 8, and 9 (identifications as shown in the record) indicate uniformly a much older style house, the majority, if not all of which appear to have been in existence at the time of the zoning classification in 1924. Additionally, the testimony that in the block north of Myrtle on the west side of Sixth Street, which is now occupied by Capitol Bank, five residences, being all of the residences in the block, have been removed would indicate a distinct lack of residential building activity. There is no testimony of any actual new residential development, except Mr. McClernon's testimony that the big two-story houses are hard to sell and are developed into multiple-family dwellings.

34

■ The outstanding fact disclosed by the testimony is the proven 40-year trend in the ten-block area on South Sixth Street, being five blocks to the north and five blocks to the south of subject property. It is not possible to consider the effect of a single zoning change in a vacuum. Consideration must be given to the changes which have taken place over a period of years and, most especially, when these changes have been created by, or approved by the municipal authorities. The Master-in-Chancery summarizes the character of the neighborhood as follows:

> "The character of the neighborhood with which we are here concerned could well be described as formerly residential but rapidly changing to a commercial area."

We think the record justifies the use of the phrases "formerly residential" and "rapidly changing."

The classifications of the Springfield Ordinance with which we are concerned are A–Residential, being chiefly one and two-family houses; B–Residential, being multiple-family use; C–1, Commercial, which includes retail sales but not filling stations; C–2, Commercial, which includes filling stations and D–Light Industrial, which among other things includes a warehouse, an automobile repair shop and car wash.

Commencing at South Grand Avenue in 1924, with an all residential classification, and proceeding south, the ten-block area on South Sixth Street has experienced more than twenty municipally authorized zoning classification changes. These changes have been spotted throughout the area. At irregular intervals, commercial or light industrial use has been authorized in the midst of residential uses.

In the first block of the area at Sixth and South Grand, on the west side, a filling station was authorized in 1926.

35

Next, south thereof, a Big Boy Drive-In Restaurant was authorized in 1962. On the east side of the street, a retail store was authorized in 1926, and on the south corner thereof, a filling station was authorized in 1961.

In the second block, commencing at Pine Street, the west side of the street was made B–Residential at a time not indicated, and the entire block on the east side was made commercial in 1956.

In the third block, commencing at Cedar Street, the south corner on the west side was commercialized in 1960. On the east side the north corner was classified Commercial in 1958, an area in the middle of the block was commercialized in 1962, and the south corner in 1961.

In the fourth block, commencing at Spruce Street on the west side, the commercial classification made in 1953 had developed into a Gulf filling station on the north, a package liquor drive-in at the center, and a Marathon filling station on the south. There is also a warehouse classification adjoining the Gulf filling station. On the east side, the north corner was made commercial in 1953 and is used as an automobile sales lot. Across Spruce Street to the north at the alley is an automotive repair shop. In the middle of the east side, one lot was commercialized in 1957 and another in 1961. On the south corner, a 1954 change to commercial, is a Sherwin Williams paint store.

In the fifth block, commencing at Laurel Street, on the west side, changes to Commercial were made in 1953, 1957 and 1961, respectively. This half block is now occupied entirely by the Capitol Bank. On the east side, a reclassification was made at the north corner in 1955, and it is a drive-in restaurant. In the middle of the block a change was made in 1954 to authorize a D–Light Industrial use, which is a car wash.

The sixth block begins at Myrtle, which includes the subject property. The west side is entirely residential and has had no changes. The east side is entirely residential and has had no changes.

36

The seventh block, beginning at Oak Street, is residential on the west side, and is a part of Iles Park on the east side.

The eighth, ninth and tenth blocks are residential on the west side. On the east side, commencing at Ash Street and proceeding south, what was formerly a transportation company garage, is now developing as a seven-acre commercial complex with parking for 300 automobiles. To the south of this complex and all the way to the railroad viaduct are commercial or industrial establishments, including a Coca Cola bottling plant, a dry cleaning plant, a large restaurant, and retail store fronts.

Thus, what was originally a ten-block residential area in 1924, has been reduced to a two-block residential area on the east side of Sixth Street, one block of which is Iles Park. On the west side of Sixth Street, the ten-block residential area has been reduced to five blocks.

Sixth Street north of the ten-block area, and to the major business area, could be considered commercial, although some residences remain.

Sixth Street was the Business U. S. 66 entrance to Springfield. Recently the City changed Sixth Street to a one-way north direction street and prohibited parking thereon. The City has also made Myrtle Street, which adjoins the subject property, a one-way east street for U. S. 66 traffic, and parking is prohibited. Thus, the northbound U. S. 66 traffic makes a right turn at the northwest corner of the subject property. Traffic on Sixth Street averages 13,000 vehicles per day and upwards of 2,000 vehicles make a right turn on U. S. 66.

It should be noted that the majority of the use changes which have been granted on Sixth Street by the City have allowed the use of the entire lot. Typical are filling stations, drive-in restaurant, car wash, automobile sales lot, and business complex. It should also be noted that the changes authorized did not go into effect one block at a time, but were so scattered that no consistent plan to

buffer any substantial part of Sixth Street against commercial encroachment appears. The west side of Sixth Street from Myrtle Street south differs from the east side in that it is continuously residential, and does not have U. S. 66 proceeding through it, but only across the front of it. It should also be noted that the zoning changes authorized on Sixth Street have not proceeded gradually from A–Residential to B–Residential and then to offices, but rather abruptly from A–Residential to Heavy Commercial and Light Industrial use.

Two realtors, James P. McClernon and John J. Bombard testified that commercialization and traffic utilization of Sixth Street has already deteriorated Sixth Street for residential purposes, and that this has proceeded so far that the introduction of a gasoline filling station on the subject property would not further devaluate neighboring residential values. Both of these witnesses have had sales experience in the area. One witness, James Dunigan, testified that in his opinion the introduction of any filling station would lower neighborhood residential values substantially. He gave no basis for this opinion and stated that he had not sold any property adjacent to a filling station within five years, nor did he have any example of deterioration in value where the property was already on a four-lane highway adjacent to other commercial construction. The Master-in-Chancery and the court believed that the testimony of the two realtors first mentioned was entitled to greater weight.

The opinion of the Master-in-Chancery is:

> "That the proposed change in the use of the property will not have a long range effect on the neighborhood since the trend to commercial use is well established. The use will not affect the demand for public on street parking. The change will not affect existing land use pattern in the neighborhood, community or metropolitan area for as mentioned above, the trend

38

to commercial use along South Sixth Street is well established."

On the other hand, the testimony established that the maintenance of the residential restriction on the subject property would diminish its value by $48,000.

■ It is apparent, without elaboration, that the recent action of the City in prohibiting parking on Sixth Street, and making it a right-hand turning corner for U. S. 66, and again prohibiting parking access on Myrtle Street, has made the subject property less desirable for residential use. While traffic alone might not be a sufficient reason for questioning a residential classification, it is an additional factor to be considered in the entire trend in the area.

Marguerite Scott, a plaintiff, testified that she had resided on the premises for eight years, but had moved because of the heavy traffic and noise. She further testified that since moving, it had been difficult to keep tenants; that the ground floor was let after a reduction in rental, but that the upper floor had not had a tenant for some time. She stated that vibration from heavy trucks, as well as dirt and dust, affected the rental of the premises. In Berger v. Village of Riverside, 69 Ill App2d 148, 216 NE2d 479, the court noted the evidence that the property could not be sold as zoned.

■ A review of many cases leads to the conclusion that a primary factor in ascertaining the reasonableness of a zoning classification is whether there has been a substantial changing trend in the development of the zoned area, or whether it remained substantially unchanged in character. Hartung v. Village of Skokie, 22 Ill2d 485, 177 NE2d 328; Gregory v. City of Wheaton, 23 Ill2d 402, 178 NE2d 358.

We believe that the authorities cited by defendant substantially acknowledge such principle. In Miller Bros. Lumber Co. v. City of Chicago, 414 Ill 162, 111 NE2d 149,

39

the court upheld a change of classification from manu-facturing to single residence. The court noted that there had been no development in the industrial classification for nineteen years, but that such development had been exclusively residential. Again, in LaSalle Nat. Bank v. City of Chicago, 6 Ill2d 22, 126 NE2d 643, the change from commercial to a classification permitting apartments was upheld, the court pointing out that in a period of 19 years there had been no commercial development. In Elmhurst Nat. Bank v. City of Chicago, 22 Ill2d 396, 176 NE2d 771, substantial and expensive new apartment con-struction justified the continuation of the residential classification. In short, new investors were relying upon the residential classification. It was also noted that the subject property neither faced, nor bordered, commercial property. In Fox v. City of Springfield, 10 Ill2d 198, 139 NE2d 732, it was observed that a number of new resi-dences had been built upon Ash Street since it was im-proved, and also that in a square area two blocks on each side of the subject property each tract was residential. The court found minor variations from the classification, but no trend to the commercial. In Gregory v. City of Wheaton, 23 Ill2d 402, 178 NE2d 358, cited by defendant, the court found that the general character of the neigh-borhood had not changed substantially for many years, although two minor variations existed. Following the same observation of trends is Hartung v. Village of Skokie, 22 Ill2d 485 on 494, 177 NE2d 328, in which the court emphasized the fact that although the major portion of the area had been zoned residential for 40 years, no such development had taken place, and affirmed a change of classification.

In Berger v. Village of Riverside, 69 Ill App2d 148, 216 NE2d 479, on 482, the court, emphasizing the conduct of the municipality in reference to the trend, stated:

"It is clear that a municipality may choose to place a buffer zone between business and commercial uses on the one hand and single family residences on the other. The difficulty here is that the Village of Riverside did not see fit to use transitional zoning in the form of duplex housing except for two blocks in this nine block strip of land."

We believe that, in view of the municipally induced and encouraged trend of South Sixth Street, both north and south of the subject property over a long period of years toward heavy commercial and light industrial uses, the placing of highway routes for one-way traffic with no parking on two sides of the subject property, the lack of any plan for transitional zoning in the area, and the fact that granting the use sought would not further deteriorate remaining residential regulations on the subject property, is arbitrary and unreasonable.

The decree of the Circuit Court of Sangamon County is affirmed.

Affirmed.

CRAVEN, P. J. and SMITH, J., concur.