MORTON BASS *et al.*, Plaintiffs-Appellees, *v.* THE CITY OF JOLIET, Defendant-Appellant.

(No. 72-317; ▮▮▮▮▮▮▮▮)

Third District—March 30, 1973.

*Rehearing denied April 25, 1973.*

James M. P. D'Amico, of Joliet, for appellant.

Robert S. Krockey, of Joliet, for appellees.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:

Defendant, the City of Joliet, here appeals from a decree of the circuit court of Will County, finding the City's zoning ordinance to be invalid in its application to property owned by plaintiffs, and also restraining defendant from interfering with the use of the property as a medical clinic. It is contended that plaintiffs were not entitled to judicial relief because they had not exhausted their administrative remedies, and, alternatively, that the decree should be reversed because plaintiffs failed to meet the burden of proof requirements imposed upon one who seeks to overcome the presumptive validity of a zoning ordinance.

The property in question consists of 12 vacant, platted lots, each having dimensions of approximately 44 × 140 feet and in total consisting of about 1.7 acres of land. Generally speaking, they are located in the easternmost part of a block bounded on the south by Glenwood Avenue; on the west by Springfield Avenue; on the north by West Acres Road; and on the east by Madison Street. Glenwood and Springfield are major traffic arteries. The lots are so situated that six of them front on Glenwood for a total distance of 266 feet, while the other six front on West Acres for the same distance. The east boundary lines of the two most easterly lots run parallel with Madison for a distance of 280.5 feet. Again speaking generally, land in the immediate area to the north of Glenwood has a residential classification of one sort or another, while the land immediately south of Glenwood is zoned R-B, a classification which permits business and professional offices and multiple family residential dwellings.

To the west of plaintiffs' lots, and within the block in which they are located, the land fronting on West Acres is improved with single family dwellings, while the land fronting on Glenwood, between the lots and Springfield Avenue, is improved with multiple family, town house dwellings. On the northwest corner of the Glenwood-Springfield intersection, a block west of plaintiffs' lots, there is a medical clinic which accommodates seven doctors, but the remainder of the immediate area

to the west and north of the intersection is improved with single family dwellings. West of the intersection along the south side of Glenwood are several businesses, including a gasoline station and shopping center. The area to the west of plaintiffs' land, across West Acres, and the area to the east, across Madison, are improved with single family dwellings for the most part.

St. Joseph Hospital and its appurtenant power plant and parking facilities are located on the south side of Glenwood directly across from plaintiffs' lots. The hospital, housed in a nine-story structure, is a full service general hospital wherein various specialized diagnostic and treatment centers are also located, and which has teaching programs for nurses and high school and junior college students. It has 463 beds, admits from 20,000 to 21,000 in-patients a year and sees about 77,000 out-patients annually, 36,000 of which are emergency room patients. On the staff are 160 doctors and 28 dentists. There are 1200 employees, of which 825 are full time. It was estimated that about 2000 persons visit hospital patients in the course of a week. All told, counting doctors, nurses, students, patients, visitors and deliverymen, some 3500 people come to the hospital each day. Under plans which were to be put into operation shortly after this case was tried, a basement and four-story addition is being constructed which will increase patient capacity by 100 beds. This expansion will require a minimum of 200 additional employees, will generate an additional 25 to 30 nursing students and will increase the number of persons coming to the hospital by approximately 400 to 500 per day. Private and public transportation to the hospital and its parking facilities are oriented to Glenwood, and the entrance to the emergency room is also off Glenwood.

The hospital property is zoned R-B, as is the land located to the south, east and west of plaintiffs' property. Along the south side of Glenwood, east of Madison, there are three medical clinics in the nearby vicinity, one of which is on the southeast corner of the Glenwood-Madison intersection diagonally across from plaintiffs' property. Also, east of the hospital is a high school. West of the hospital, along the south side of Glenwood for a distance of half-mile are uses by various businesses and institutions. South and east of the hospital, along Madison, are two nursing homes, two high-rise apartment buildings and a veterinary clinic.

While we do not find the exact date in the record, it appears that plaintiffs' lots were zoned R-2 in 1958 and that such classification was continued by a revised ordinance enacted in 1968. Under such classification, both before and after the revision of the ordinance, permissible uses are: one family residences; general education or religious schools; churches and parish houses; social and recreational facilities; public parks and

playgrounds; public libraries and the public cultural uses; essential public services such as water towers; and farms, private stables, nurseries; truck gardens or greenhouses.

Plaintiffs purchased their lots from an estate in 1966 at a cost of $20,000 and in 1967 sought to have the land rezoned to a classification which would permit its use for multiple family town houses. The application was denied. Several years thereafter, plaintiffs entered into an option to sell the property to a group of orthopedic surgeons, subject to suitable rezoning which would permit its use for a medical clinic. As is frequently the case, the burden of procuring the rezoning was placed upon the optionees. Accordingly, on November 2, 1971, an application was filed in the names of the plaintiffs for rezoning to an R-B (medical complex) classification. After a public hearing on December 2, 1971, the Plan Commission recommended to the city council that the application be denied. The council did not act on the recommendation, but, instead, recommended that the commission be petitioned to reconsider the application under the City's Planned Unit Development ordinance. This suggestion was followed and such a petition was filed in plaintiffs' behalf on December 23, 1971. A second public hearing was held on March 2, 1972, at which time the optionees presented their site plan, but the commission again recommended that the application be denied on the ground that plaintiffs' tract (1.7 acres) lacked the five or more acres necessary to bring the project within the purview of the planned development ordinance. Completing the dilatory circuity of negative action, the council, on April 11, 1971, voted to concur in the recommendation of the Commission. The action of plaintiffs for declaratory and injunctive relief from which this appeal stems soon followed. At the trial it appears that a site plan was introduced in evidence which differed in some respects from the plan submitted to the Commission.

■■ Before considering the other issues raised by the appeal, and the evidence relating thereto, we deem it expedient to first consider the contention of defendant that plaintiffs were not entitled to judicial relief because they failed to exhaust their administrative remedies. (See: *Bright v. City of Evanston*, 10 Ill.2d 178; *Reilly v. City of Chicago*, 24 Ill.2d 348.) The rule of exhaustion of administrative remedies, unique to zoning cases, is no more than an expression of judicial policy which recognizes that zoning is primarily an administrative function, and is aimed at affording local authorities an opportunity to correct errors and settle disputes before there is judicial intervention. It is not jurisdictional, however, nor is it unreasonably employed, and to prevent needless delay, increase of costs and circuity of action. It is not applied where the demonstrated attitude of the local authorities makes it clear that ad-

ministrative relief, or further efforts to obtain it, will not be forthcoming. *County of Lake v. McNeal,* 24 Ill.2d 253; *Van Laten v. City of Chicago,* 28 Ill.2d 157.

■■ The record here discloses, without dispute, that the city zoning officials had twice refused to rezone the property for use as a medical clinic before judicial relief was sought. Therefore, it would appear that the trial court was eminently correct in its finding that there had been an exhaustion of administrative remedies. Defendant reasons, however, that since it was the optionees who carried the burden of the proceeding before the city, it cannot be said that plaintiffs, the optionors, have ever sought administrative relief. Further, since the site plan introduced in evidence in this judicial proceeding was not precisely the same as the plan presented to the commission, it is urged that there can be no exhaustion of administrative remedies until the Commission is again permitted to consider the rezoning application in light of the altered site plan.

While it is questionable as to whether these contentions were in fact raised and passed upon in the trial court so as to be properly preserved for review, it is sufficient to say we do not find merit in the marginal distinctions defendant seeks to make. The commission's refusal was not based upon any inadequacy of the site plan presented, but on the ground that the site itself was not of sufficient size to permit its use for a planned unit development. Also, all the administrative actions were carried on in the names of the plaintiffs, and, more significantly, the issues presented to and decided by the local authorities are precisely the same issues raised in this judicial proceeding, *viz.,* whether plaintiffs' property should be changed from an R-1 to R-B classification and permitted to be used for a medical clinic. The case of *American National Bank & Trust Co. v. City of Chicago,* 130 Ill.App.2d 24, upon which defendant principally relies is inapposite. There the property owner sought to have his land rezoned from R-1 to R-4 at the administrative level, but then altered his position and sought a change from R-1 to R-3 in the judicial proceeding which followed. Under these circumstances, which have no valid parallel in this case, it was held that the owner had not exhausted his administrative remedies. Apart from the shortcomings of defendant's theories, we are also constrained to observe that the history of the efforts to have such disputed property rezoned makes it apparent that it would be a fruitless gesture to again submit the matter to the local authorities. *Cf. First National Bank of Skokie v. City of Chicago,* 25 Ill.2d 366; *Fiore v. City of Highland Park,* 76 Ill.App.2d 62.

On the principal issue of whether the ordinance was invalid in its application to the disputed property, plaintiffs presented the testimony

of Gerald R. Fahrner, a professional real estate appraiser. He testified that the twelve lots owned by plaintiffs were undersized for single family residences under standards fixed by the city's building code, and that because of this, only eight single family residences could be erected on the site. On this basis he testified that the value of the premises for single family purposes would be $56,000 or $7,000 per building site. Based upon comparable sales in the area, he estimated that the value would be $104,000 if the property was permitted to be used for a medical clinic. Further, the witness conceded there was a demand for residential lots in the general area north of Glenwood, but expressed the belief that plaintiffs' lots had nonetheless remained vacant and unsold because they were not suitable for single family residence purposes. Factors upon which he based his belief were the smallness of the lots, the dominating influence of the hospital (directly across the street) and the presence of the multiple family town house development in part adjacent to plaintiffs' lots on the west. The witness further testified that the highest and best use of the property would be for a medical clinic, and gave his opinion that such use would not reduce the value of the eixsting nearby residential uses, but would in fact enhance values and constitute a general improvement of the area.

Robert T. Van Treeck, a planning and zoning consultant, also testified for plaintiffs that the highest and best use of the property would be for a medical clinic. As grounds therefor, he stated that the property took its character from the hospital and that the location of a clinic in close proximity to the hospital would benefit the community, patients and doctors alike. As an experienced planner, he testified that the hospital and the traffic on Glenwood dictated that the north side of Glenwood, across from the hospital, should be developed as a transitional use zone which would serve as a buffer between the hospital and the single family residential zones on West Acres and west thereof. In this regard, he further testified that a medical clinic would be an ideal use in such a transitional zone. Additionally, he stated that a medical clinic would neither be incompatible with nearby residence properties nor decrease their value, and that a medical clinic would be no more incompatible with nearby residences than would other uses permitted under the R-2 classification, notably churches, schools, library or recreational facilities. The latter uses, he stated, would entail a site plan comparable to that for a medical clinic, and it was his opinion that the site plan admitted into evidence in the case would effectively and artistically screen the clinic from the nearby single family residences. Concluding his testimony, Van Treeck stated that traffic generated by a clinic would have no appreciable effect on the already heavily traveled Glenwood Avenue

and, at the same time, manifested a belief that the traffic on Glenwood was a factor which rendered plaintiffs' property unsuitable for single family residential use.

Dr. Noel A. Bass, one of the plaintiffs, testified to the previous effort to have the property rezoned to a classification which would permit its use for town houses. He also testified that he had attempted to sell the property by listing it with various realtors, that his asking price was $4500 per lot, or $50,000 for all 12 lots, and that no offers of purchase had ever been received until the group of orthopedic surgeons took their option. With regard to the site plan for the proposed clinic, the doctor testified that the building was designed to accommodate from six to eight doctors; that there would be vehicular entrances to the premises off both Glenwood and Madison; that all parking would be on the west side of the premises to encourage entry from Glenwood; that there would be landscaping on all sides of the premises except the Glenwood side; and that the landscaping across the rear, fronting on West Acres, would be elevated on a berm and thus provide even greater screening in that direction.

Both Dr. Bass and Thomas J. Sukikatas gave testimony as to the community need for a medical clinic. The latter, executive director of the Will-Grundy-Kankakee County Comprehensive Health Planning Council, testified that the population in Will County had increased slightly over 30% in the period between 1960 and 1970; that projections were for additional large increases; that the present population of Will County was 250,000; and that such population was served by some 160 physicians, some 20 of which, such as pathologists and radiologists, were not directly associated with patient care. According to his further testimony, the doctor-patient ratio in the county was one to 1500, as compared to a national ratio of one doctor per 863 persons and a state ratio of one per 813 persons. On this basis he stated that the area needed more physicians to deliver services and more primary health care entry points, such as clinics, to which patients could come for services. A clinic on plaintiffs' property, he stated, would benefit the population of the area in that it would allow another access into the care system and would also allow ready access to the full service hospital located nearby. A further circumstance from which the population would benefit, would be that the nearness of hospital and clinic would allow physicians to conserve their time and better utilize it for patient care. Dr. Bass testified along the same lines and also stated that there was a shortage of medical practitioners in the area, and that a medical clinic such as proposed would provide an entry point into practice which would attract new physicians.

In the brief presented to this court, defendant relies principally on the

testimony of its witness Allen Kracower, a city planner and landscape architect, and Franklynn B. Albert, the city's director of community planning. Excluding the element of value from his opinion, Kracower testified that the highest and best use of plaintiffs' property would be some form of residential development, preferably single family housing. As the basis therefor, he stated that ninety percent of the land north of Glenwood in the immediate area was residentially developed in accordance with a master plan adopted in 1958; that such residential development fixed the character of plaintiffs' property, and, conversely, that the hospital should have no effect on the use of the property; also, that a medical clinic would be incompatible with nearby single family residences and reduce their value. Somewhat inconsistently, however, he stated that residential areas should be located in such a way as to protect them from noise, traffic and "other objectionable items". On the subject of traffic, he expressed the belief that a medical clinic on plaintiffs' property would generate only slightly more traffic than would single family residences, but conceded that no serious traffic problem would be created by either use. Albert testified that the highest and best use of the land was "some sort of medium density residential development", giving as his reasons that any other use would generate objectionable traffic in a residential area and that the character of the property was fixed by the residential development north of Glenwood. He stated also that a medical clinic would be incompatible with existing residences, and that there were vacant properties to the south of Glenwood with zoning which would permit a medical clinic to be built.

Also testifying for the defendant were Barbara Crosser, the chief planner on Albert's staff, and Mrs. Roger Dalton, the owner of a single family residence on Madison. The latter testified that she had purchased her property in anticipation that plaintiffs' land would be developed with single family residences. The former testified as to the various zoning classifications in the city and expressed the opinion that it was reasonable to exclude a medical clinic from an R-2 residential zone because of the traffic generated and the parking facilities required. Further, she stated that she could see no inconsistency or unreasonableness in the fact that churches, schools, libraries and social facilities were permitted uses in and R-2 zone, even though such uses would also require off-street parking and would generate additional traffic.

■■ A zoning ordinance is clothed with a presumption of validity, and it is a fundamental proposition that a party attempting to overcome the presumption must do so by clear and convincing evidence. More specifically, in a case such as this, the property owner has the burden of proving that the zoning classification under attack bears no reasonable

relation to the public health, safety, welfare or morals, (*Trendel v. County of Cook*, 27 Ill.2d 155), and a concomitant burden of proving that the use he proposes to make of his property is reasonable and will not be detrimental to the public health, safety, welfare or morals. *Mangel & Co. v. Village of Wilmette*, 115 Ill.App.2d 383.

■■■ Based upon these principles, it is first contended by defendant that plaintiffs failed to meet such burdens, and in so contending, it is represented that the only matters proved by plaintiffs were that the property would be worth more if put to the use sought, and that the residential classification was unreasonable because the property abutted in a heavily traveled street. However, from the evidence already detailed (which will subsequently be discussed) it is at this time a sufficient answer to defendant's contention to note that plaintiffs' proof was not so narrowly circumscribed. Next, it is asserted that plaintiffs' proof relating to the highest and best use of the property, the impact of the proposed use on other properties and the effect on property values was not of the clear and convincing character required to overcome the presumption of validity due to the opposing testimony given on such matters by defendant's witnesses. This contention is without merit. Our courts have consistently held in zoning cases that a mere conflict of testimony as to such matters does not create an irrebuttable presumption that an ordinance is valid, or require a finding that the reasonableness of the ordinance is debatable. (*Lakeland Bluff, Inc. v. County of Will*, 114 Ill. App.2d 267; *La Salle National Bank v. County of Cook*, 12 Ill.2d 40; *Bauske v. City of Des Plaines*, 13 Ill.2d 169). As in all cases, such conflicts go to the credibility of the witnesses and the weight to be accorded their testimony, which are matters to be determined by the trier of fact, and unless manifestly against the weight of the evidence, such determination will not be disturbed on review. *Walz v. Traders Development Corp.*, 80 Ill.App.2d 386; *Northern Trust Co. v. City of Chicago*, 4 Ill.2d 432.

■■ The trial court here, in essence, made two completely consistent determinations. First, that the single family residence classification was arbitrary, unreasonable and its continuance unnecessary for any reason of public health, safety, welfare or morals; and second, that the proposed use of the property as a medical clinic was reasonable and in the best interests of the public and the community. On the basis of all the evidence, and under well established principles of zoning law, we cannot say that the findings of the court were against the manifest weight of the evidence, or that the court has in this case substituted its judgment for that of the zoning authority.

■■■ Apparent in the general arguments of defendant, and in the

testimony of its principal witnesses, is a posture that the single family residence classification is reasonable and justified, and should remain unchanged, because the greater part of the land north of Glenwood in the immediate vicinity of the hospital is zoned and used for single family residences. While the general zoning plan is an important factor in determining the reasonableness of a use classification, it is not a conclusive factor. As stated by the court in *Eleopoulos v. City of Chicago*, 3 Ill.2d 247, 250: "The general scheme of zoning may be valid, yet, when applied to a particular piece of property and under a particular set of circumstances it may be so arbitrary and unreasonable as to result in a confiscation of that property. In that situation, as applied to the disputed real estate, the ordinance is void." Despite the general plan of zoning, the facts and circumstances emerging from the proof in this case compel a conclusion that the single family residence classification is arbitrary, unreasonable and confiscatory.

■■ The suitability of the disputed property for the zoned purpose is one factor to be considered in determining the reasonableness of a rezoning restriction (*Krom v. City of Elmhurst*, 8 Ill.2d 104), and it is a telling factor here. The testimony of plaintiffs' witnesses that the property was rendered unsuitable for single family residential purposes due to the dominating influence of the hospital directly across from it, the multiple family town house dwellings adjacent to it and the traffic on Glenwood Avenue, stands virtually unrefuted in the record. Defendant's witnesses made no mention at all of the impact the adjacent multiple family dwellings would have on single family use, and only Kracower made reference to the hospital, his testimony being only that the hospital "should not" have any influence on plaintiffs' property. The same witness agreed with plaintiffs' witnesses, as many courts have found, that heavy traffic does much to cause property to be unsuited and undesirable for single family residential purposes. (*E.g. Chicago Title and Trust Co. v. Village of Wilmette*, 27 Ill.2d 116; *Petropoulos v. City of Chicago*, 5 Ill.2d 270.) Apart from the volume of traffic coming to the hospital by way of Glenwood each day, common knowledge dictates that the type of traffic coming to the hospital's emergency room 24-hours a day would render plaintiffs' land even less suitable for single family dwellings.

■■ Speaking perhaps most forcefully and eloquently as to the unsuitability of the property for single family use is the circumstance that it has remained vacant and unimproved under such use classification, even though, as a witness for plaintiffs testified, there was a demand for residential property in the area. (See: *Krom v. City of Elmhurst*, 8 Ill.2d 104; *Chicago Title & Trust Co. v. Village of Wilmette*, 27 Ill.2d 116.) The argument of defendant that this factor may not be considered

here because the property has remained vacant due to plaintiffs' "own voluntary choice" is totally without support in the record. Plaintiffs' obtained no control over the use or destiny of the property until they purchased it is 1966, and, so far as we can ascertain from the record, it had remained vacant under the single family residential classification for many years prior to that time. Most persuasive is the testimony of Dr. Bass that the property had been almost continuously listed with real estate brokers for sale on a basis of $4500 per lot, but had produced no takers. It stands unrefuted. That the lots were not priced out of the market is clearly shown by the uncontradicted testimony of Fahrner that single family residential lots in the area were selling for $7000 per lot, and that the city's building code would require one purchasing plaintiffs' lots to utilize one and one-half lots for single family use. While not a factor in determining the reasonableness of the single family classification, the charge, (that plaintiffs' property has remained vacant through choice), is met by the proof that plaintiffs' efforts to have the premises rezoned for town house purposes, a use to which a part of the adjoining property was being put, was denied by the city.

■■■  Two complementary factors also considered by the courts in determining the validity of a zoning classification in its application to a particular property are, first, the extent to which the value of the property in question is diminished by the zoning limitation, and, second, the extent to which the removal of the classification would depreciate the value of other properties in the area. (*Hartung v. Village of Skokie*, 22 Ill.2d 485; *Myers v. City of Elmhurst*, 12 Ill.2d 537.) Based upon the evidence, it is our opinion that the application of these factors also show the arbitrary and confiscatory nature of the single family residence classification here. Fahrner testified for plaintiffs that the property had a value of $56,000 for single family residence purposes, as opposed to a value of $104,000 for medical clinic purposes, and both he and Van Treeck stated that the proposed use would not diminish the value of surrounding properties, but would undoubtedly enhance the area. It is true that Kracower testified for defendant that to put a medical clinic "within the midst of a single family area" would decrease the value of the single family homes; however, the basis of his opinion was not in conformity with the facts. Plaintiffs' property is not in the midst of a single family area. As noted before, it is in part adjacent to a multiple family residential development and is across from the hospital complex. We think it pertinent to observe, also, that other uses permitted under the R-2 classification, such as private stable, water towers and schools, would have a greater and more certain depreciating effect on surrounding residence properties than would a medical clinic.

■■ Still another commonplace principle of zoning law, having application here, is that where the public interest in continuing a restrictive classification is nonexistent or insignificant as compared with the hardship placed on the owner, the classification is deemed unreasonable and in violation of the constitutional guaranties of due process and equal protection of law. (*Exchange National Bank v. County of Cook*, 6 Ill.2d 419, 425; *Lakeland Bluff, Inc. v. County of Will*, 114 Ill.App.2d 267.) The hardship on the owner in this case and the insignificance of the gain to the public by a continuance of the single family classification are apparent. Apart from monetary considerations, which show that the property will be worth $48,000 more if used for a medical clinic, the record shows that it had not attracted single family residence purchasers and that the efforts of plaintiffs to rezone it for multiple family purposes have been thwarted. As a consequence, the effect of the single family classification has been confiscatory, and has, as a practical matter, prevented the use of the premises for any purpose. We find no evidence of a public purpose or gain which will be realized by a retention of the classification. Rather, the reverse is true. Development of the property as a medical clinic will cause the premises to be more productive on the tax rolls, and will in part satisfy an undisputed community need by providing an entry point for patients and doctors alike into the health care system. In short, we conclude that the loss which plaintiffs will suffer, is totally unrelated to any substantial public benefit.

As previously detailed, plaintiffs offered proof which established that the use of their property would be reasonable and in the public interest. By its proof and arguments defendant makes no denial that the development of the clinic would be in the public interest, but attacks the reasonableness of the use on the ground that it would increase traffic in a residential area and expose nearby residences to an automobile parking lot. Neither claim is tenable on this record. As to the latter, it appears that permitted uses under the R-2 classification, such as library and social or recreational facilities, would also require off-street parking on the premises. As to the former, defendant's own witness testified that a commercial use of the premises would generate but slightly more traffic than single family use and, in any event, that neither use would create a serious traffic problem. Furthermore, it appears that the parking lot for the clinic will be oriented to Glenwood, thus minimizing any substantial traffic through the residential area to the north of plaintiffs' property.

Aimed in part at preventing a property owner from giving evidence of a proposed use of the property and then utilizing it for a substantially different use once the existing zoning has been found invalid, it was held

by the court in *Sinclair Pipe Line v. Village of Richton Park*, 19 Ill.2d 370, 379: "In our opinion, it is appropriate for the court to avoid these difficulties by framing its decree with reference to the record before it, and particularly with reference to the evidence offered at the trial. In most of the cases that have come before us in recent years, a specific use was contemplated and the record was shaped in the terms of such use. In such cases the relief awarded may guarantee that the owner will be allowed to proceed with that use without further litigation and that he will not proceed with a different use." Subsequent decisions applying this rule have held that the specific use permitted may not be framed in terms that are too broad, as for example in *Fiore v. City of Highland Park*, 76 Ill.App.2d 62, 75-76, where the decree ordered that the disputed property be permitted to be used "for multiple family dwellings under the classification 'F' of the Highland Park zoning ordinance."

■■ In the present case plans for the proposed clinic were introduced into evidence, and the decree expressly provided, "* * * the plaintiff [sic] is entitled to develop said real estate for a medical clinic in accordance with the proposed plan and diagrams which were entered into evidence." Without more, therefore, it is manifest that there was meticulous compliance with the rule, and that the decree is not subject to the charge that it was too broad. There was, however, no direct evidence as to who was going to build the clinic, or when it was to be built, and on this basis defendant argues that such decree was rendered too broad and speculative. We cannot agree with this contention. The rule of *Sinclair Pipe Line* is directed to the specific use of the property, and who shall make the use, or when (within reasonable limitations), is immaterial so long as the use complies with the decree of the court. The decree here directs that the clinic shall be built in accordance with the proposed plans and diagrams which were entered into evidence. Should the person or persons availing themselves of the benefit of the decree fail to comply, defendant is not without its remedy to prevent it.

Considering all the facts and circumstances of the case, it is our opinion that the single family residence classification of plaintiffs' property is arbitrary, confiscatory and unreasonable and that it is unrelated to the public, health, safety, welfare or morals. Conversely it is our further opinion that the use of the property for a medical clinic is shown to be reasonable and in the public interest. Accordingly, the decree of the circuit court of Will County is affirmed.

Decree affirmed.

DIXON and SCOTT, JJ., concur.