470

BENJAMIN W. KASZYNSKI *et al.*, Plaintiffs-Appellees, *v.* THE CITY OF PERU *et al.*, Defendants-Appellants.

(No. 74-7;

Third District—July 25, 1975.

STOUDER, J., dissenting.

Helmig and Helmig, of Peru (Charles W. Helmig, of counsel), for appellants.

Anthony C. Raccuglia, of Peru, for appellees.

Mr. JUSTICE STENGEL delivered the opinion of the court:

Defendant, City of Peru, appeals from the decree of the Circuit Court of La Salle County, declaring the city's zoning ordinance to be invalid in its application to plaintiffs' property, and enjoining the city from enforcing the ordinance against plaintiffs' property. Defendant contends that the decree should be reversed because plaintiffs failed to meet the burden of proof required to overcome the presumptive validity of a zoning ordinance.

The property in question consists of two adjacent lots located at the southeast corner of Shooting Park Road and Pine Street in Peru, Illinois. The corner lot is vacant and the adjacent lot to the east fronting Shooting Park Road is improved with a one-family residence. Surrounding this property to the east and south are one-story residences zoned for single-family use.

On the southwest corner of the intersection is a single-family dwelling zoned B-5 commercial, which is presently used as a law office. Immediately west of the law office are lots containing a hamburger drive-in, a gas station and a combination department store and food center, all of which are zoned B-4 commercial. The department store-food center is bordered on the west by United States Highway 51.

From the northeast corner of Route 51 and Shooting Park Road extending east are a large discount department store, a food market, a trust and savings bank, a gas station and Marquette Street, which is a two-lane offset going north from Shooting Park Road. All of this property is zoned B-4 commercial.

Extending east from Marquette Street is an automobile agency, with service facilities and new and used car lots. Immediately east of the car lot is a real estate office and warehouse, a commercially-zoned vacant lot, a car-wash facility, a gas station and a retail liquor outlet. All of the aforesaid properties were zoned B-4 commercial. The real estate office and warehouse stand directly across from the subject property.

Because of the rapid changes in the surrounding area, plaintiffs sought to have the lots rezoned from a single family residential classification (R-1) to a real estate office under a B-5 classification. Plaintiffs' petition to reclassify was denied by the Planning Commission and plaintiffs then brought this action in the trial court to declare the ordinance void as it applied to their property.

Plaintiffs offered the expert testimony of three real estate appraisers to the effect that it was no longer feasible to continue using the property for residential purposes. Their testimony was that the highest and best use was a commercial B-5 classification and that the property takes its useage from the commercial development to the west and north of the subject lot. The witnesses agreed that the proposed use as a real estate office would not have deleterious effects on the residential property adjoining the lot. One of the expert witnesses had been consulted for the original plan for the city and had recommended an R-2 classification for the disputed property. He testified that his opinion had changed, however, because it was "bad zoning to have an R-2 classification facing an arterial highway across the street from commercial uses."

The defendants' evidence included the testimony of two homeowners in the area. These witnesses testified that problems of traffic, parking, storm water drainage, and lighting had resulted in the area as a consequence of the intrusion of commercial development. Defendants' other witness was a member of the Planning Commission of Peru, who testified that the purpose for continuing the R-2 classification was to halt commercial development at the corner; allowing a B-5 classification would increase lighting and drainage problems to the property to the south.

Upon the conclusion of the hearing, the trial court found that the ordinance as applied to the disputed property was illogical and unreasonable. The court made the following findings: (1) that the property would carry an increased value, and that the highest and best use, economically, would be nonresidential; (2) that the present classification of the tracts were intended as a holding pattern against further commercial development from the west along the south side of Shooting Park Road and that the plan was to restrict such development east, but to encourage it to the north; (3) that an unrestricted B-5 classification would allow the entry of unwanted uses, but the proposed real estate office would be an attractive and harmonious addition to the neighborhood; (4) that since the adoption of the ordinance and the decision not to reclassify, further commercial development augmented or encouraged by the change in Shooting Park Road had occurred; (5) that the disputed property takes its usage from the commercial development along Shooting Park Road; (6) the proposed real estate office would constitute an attractive adjunct to the neighborhood and would be harmonious and compatible with the existing uses. The court determined that to allow usage as a real estate office would permit a more uniform tapering off from commercial to residential zoning.

The issue presented upon appeal is whether the finding of the trial

court that the ordinance was invalid was based upon sufficient evidence to overcome the presumption of legislative validity.

The city bases its arguments primarily on the oft-cited proposition that a zoning ordinance is presumed to be valid, and a party that wishes to overcome the presumption must do so by clear and convincing evidence. (*Bass v. City of Joliet*, 10 Ill.App.3d 860, 869, 295 N.E.2d 59 (1973).) More specifically, the person attacking the classification has the burden of proving that the ordinance bears no reasonable relation to the health, safety, welfare and morals of the community, and that the proposed use is reasonable and nondetrimental to the public welfare. (*Bass v. Joliet.*) It has been repeatedly held that where the net result of the conflicting testimony is to leave the reasonableness of the ordinance subject to a fair difference of opinion, the legislative judgment should be followed. *Marquette National Bank v. County of Cook*, 24 Ill.2d 497, 182 N.E.2d 147 (1962).

■■ The courts of this State have recognized, however, that the validity of each ordinance must be determined by the facts of each circumstance. (*Hartung v. Village of Skokie*, 22 Ill.2d 485, 177 N.E.2d 328 (1961).) Mere conflict in testimony does not necessarily create an irrebuttable presumption of the validity of an ordinance, or require a finding that the reasonableness of the ordinance is debatable. (*Lakeland Bluff, Inc. v. County of Will*, 114 Ill.App.2d 267, 232 N.E.2d 765 (1969).) Such conflicts go to the credibility of the witnesses, and the weight to be accorded their testimony is a matter to be determined by the trier of fact; unless manifestly against the weight of the evidence, such findings will not be disturbed on appeal. *La Salle National Bank v. County of Cook*, 12 Ill.2d 40, 145 N.E.2d 65 (1957); *First National Bank of Skokie v. Village of Morton Grove*, 12 Ill.App.3d 589, 299 N.E.2d 570 (1973).

In the case at bar, the evidence was uncontroverted that the area had changed greatly. The plaintiff purchased the property 8 years prior to the trial. In that relatively short period of time, the record shows the general nature of the area has changed from single-family residential to commercial. The disputed property is the only corner of the intersection that has remained residential. The other corners have become a law office, an automobile dealership and a real estate office. In the block immediately west of the subject property a hamburger stand, a discount department store, a grocery store, a savings bank and a gas station have been built. Only 2 years prior to this action, the general nature of Shooting Park Road fronting plaintiffs' property also changed. A two-lane street has been improved to a modern 66-foot-wide four-lane thoroughfare with curbs and gutters, and it is now a major arterial connection bearing a much heavier traffic load.

We cannot ignore the unanimous and uncontroverted testimony of plaintiffs' experts that in their opinion the highest and best use of the subject lots was commercial. The experts testified that the disputed property's character was derived from the commercial property at the intersection, and from the area north and west of the plaintiffs' lots. Their testimony also indicated that the proposed use as a real estate office would not be detrimental to the neighboring residential property. Problems of water, sewage, traffic or lighting would not be increased and property values of adjoining lots would be maintained by the proposed use.

The only evidence in support of the present classification was a statement by the Chairman of the Planning Commission that the purpose of retaining the residential classification was to protect the adjoining single-family property and that rezoning would allow any use under a B-5 classification (*e.g.*, bowling alley or funeral home) which could increase lighting and storm water drainage. However, the order entered by the trial court specifically limited plaintiffs and their successors to business and professional office uses and does not permit any of the other uses under B-5 zoning. The order further restricted any improvements to a one-story building (17 feet high), 100 feet by 25 feet in size, with a 75-foot setback as well as other landscaping requirements. The trial court found that a business office usage would permit "a more uniformed tapering from commercial to residential * * *" than now exists.

Defendants argue that no evidence was introduced concerning the value of the subject property. In reviewing the record, we find that plaintiff, as a witness, testified that in his opinion the value of the property as presently zoned was unchanged from his purchase price, but that it would triple in value if commercially rezoned. Defendants introduced no evidence of the disputed property's value.

The Illinois Supreme Court has set forth following significant factors for determining the validity of zoning classifications:

> "the character of the neighborhood; the extent to which the value of the subject property is diminished by the limitations; the extent to which the removal of the limitation would depreciate the value of other property in the area; the suitability of the property for the zoned purposes; existing uses and zoning of nearby property; the length of time under the existing zoning that the property has remained unimproved, considered in the context of land development in the area; the relative gain to the public as compared to the hardship imposed on the individual property owner; and the extent to which the ordinance promotes the health, safety,

morals or general welfare of the public. [Citations.]" *Hartung v. Village of Skokie,* 22 Ill.2d 485, 494, 177 N.E.2d 328, 333 (1961). ██ A review of cases applying these factors show the most important inquiry to be whether the property is zoned in conformity with surrounding and existing uses. (*La Salle National Bank v. Village of Palatine,* 92 Ill.App.2d 327, 236 N.E.2d 1 (1968).) Property may take its character from the surrounding property and thereby invalidate the zoning classification as applied to it. (*Bluhm v. City of Chicago,* 110 Ill. App.2d 136, 143, 249 N.E.2d 108 (1969).) A primary factor in ascertaining the validity of the ordinance is whether there has been a substantial changing trend in the development of the zoned area; an ordinance was invalid where the character of the area could be described as formerly residential but rapidly changing to commercial. (*Scott v. City of Springfield,* 83 Ill.App.2d 31, 226 N.E.2d 57 (1967).) This trend is particularly important when it is municipally induced and encouraged. (*Scott.*) While it is true that the value of the property is a factor to be considered, the failure of plaintiffs to show a great financial loss should not preclude them from challenging a classification which treats their property differently from other property similarly located. *Berger v. Village of Riverside,* 69 Ill.App.2d 148, 216 N.E.2d 479 (1966).

██ We have reviewed the record and find that the defendants' evidence was so minimal and unconvincing that it did not overcome the evidence existing in plaintiffs' favor. We conclude that the judgment order of the trial court should be affirmed. In a substantially similar case where a multiple-family residential use was sought for a corner property, the Illinois Supreme Court stated:

> "This property is a corner lot and the properties on the other three corners are devoted to business  *  *  *  uses. We think it is clear that the character of the property involved here is determined by the business uses on the other corners of the intersection and the uses along Pulaski Road rather than the residential uses in the block in which the property is located. The gain to the public from a continuance of the existing zoning is small compared to the substantial loss to the owners of this property." (*Mutual National Bank v. City of Chicago,* 26 Ill.2d 342, 346, 189 N.E.2d 341 (1962).)

We believe the same principles apply to the case at bar.

Defendants on appeal have also contended that the property in question is burdened with covenants in the deed which restrict its use to single-family residences. From the record it appears that this issue is

argued for the first time on appeal and thus cannot be properly considered in this proceeding.

The judgment of the circuit court is therefore affirmed.

Affirmed.

ALLOY, J., concurs.

Mr. JUSTICE STOUDER, dissenting:

I do not agree with the majority of the court. In my opinion the evidence amply demonstrates that the maintenance of the zoning classification was not arbitrary, unreasonable or confiscatory but on the contrary was well within the legislative prerogatives vested in the municipality's legislative body. Generally speaking I believe the majority has correctly set forth the principles applicable to zoning cases, but in my mind such principles have not been applied as required by the principles themselves. At the outset I think it necessary to emphasize that the issue which the trial court was required to determine is whether there were substantial facts supporting the exercise of legislative discretion. If there were, such legislative action, or as in the instant case, legislative inaction, is not subject to the claim of arbitrariness or confiscation. In this respect it should be borne in mind that the trial court because of the nature of the case and posture of the parties is not reviewing the action of an administrative agency or the sufficiency of the evidence to support such agency's determination, nor is the trial court concerned either with evidence or facts which the legislative body may or may not have considered in the exercise of its legislative discretion. Although secondarily we are concerned with the sufficiency of the evidence to support the trial court's determination, the primary issue is the propriety of legislative discretion.

The principle which requires that a property owner assume the burden of proving an ordinance confiscatory or arbitrary is of special significance in a zoning case because of the nature of the judicial proceeding in which such questions must be considered. Often, as in the instant case, the result sought or achieved is spot zoning for a special use. The double aspect of this problem is illustrated by the instant case where restrictions are sought to be held inapplicable to a single tract even though, as will be later demonstrated, the effect of the decision may extend far beyond the borders of the property in dispute to property beyond the jurisdiction of the court. Likewise the court is concerned not with the general use of the property in question but with a specific use of a specific building for a particular business purpose. Although such results may be an unavoidable incident of the judicial process they do not constitute good

zoning or land-use procedures and suggest that judicial interference in zoning matters requires great deference to legislative discretion and corresponding judicial restraint. *Treadway v. City of Rockford,* 24 Ill.2d 488, 182 N.E.2d 219.

In determining whether the legislative action is confiscatory or arbitrary the factors which should be considered are well set forth in *Hartung v. Village of Skokie,* 22 Ill.2d 485, 177 N.E.2d 328, referred to by the majority. Such case as well as others (*Myers v. City of Elmhurst,* 12 Ill.2d 537, 147 N.E.2d 300, and *La Salle National Bank of Chicago v. County of Cook,* 12 Ill.2d 40, 145 N.E.2d 65) illustrate the nature and application of such factors and offer instructive guidelines by which the facts and findings of the court in the instant case can be judged.

The factors which have been deemed relevant in determining whether the zoning restrictions bear a reasonable relationship to the admittedly proper general purposes of zoning regulations are set forth in *Hartung v. Village of Skokie,* 22 Ill.2d 485, 494, 177 N.E.2d 328, as follows:

> "*  *  * the character of the neighborhood; the extent to which the value of the subject property is diminished by the limitations; the extent to which the removal of the limitation would depreciate the value of other property in the area; the suitability of the property for the zoned purposes; existing uses and zoning of nearby property; the length of time under the existing zoning that the property has remained unimproved, considered in the context of land development in the area; the relative gain to the public as compared to the hardship imposed on the individual property owner; and the extent to which the ordinance promotes the health, safety, morals or general welfare of the public."

The foregoing factors do of course represent special or individual aspects of the total problem, and although each factor should be considered in its aspect most favorable to the legislative action, in the final analysis they must be considered as a whole; and if from such consideration there is substantial support from such factors favoring the exercise of legislative discretion, such discretion must be upheld. If, on the other hand, considering the factors as a whole there are no substantial facts supporting the exercise of legislative discretion, it follows that such legislative discretion has been arbitrarily and illegally exercised. This rule follows from two major premises. The first is that there is a presumption of validity of legislative action and the second that courts are not concerned with the wisdom of legislative action.

It is most helpful here to examine each of these factors as they apply to the instant case. The first is the character of the neighborhood. There is no dispute that at the time of purchase of the property by plaintiffs

all four corners at the intersection in question here were zoned R-2 residential. Since that time the other three corners are now zoned for commercial use. It is also without dispute that the purpose of the Planning Commission is to encourage commercial development on these other three corners but to establish a holding area against further commercial development on the southeast corner where the plaintiffs' property is located. The character of the neighborhood extending from the southeast corner is entirely residential. Most of the commercial development described by the witnesses and the majority of the court lies west of the intersection at which the subject property is located. There are only two or three commercial uses located on the north side of Shooting Park Road opposite the property on the south side of Shooting Park Road east of the intersection.

The trial court in its opinion appears to have considered that because the property lying south and east of the intersection is a "holding pattern" such fact somehow or other unfavorably affects maintenance of the zoning classification and supports the claim that the maintenance of such restriction is arbitrary. This is not the case but on the contrary indicates that such a characterization is a condition peculiarly within the legislative ambit and represents essentially the discretionary nature of the problem. For example, Carl Gardner, one of plaintiffs' witnesses, stated, "The classification was a transitional-type usage which would remain until a petitioner could successfully convince the community that a change was proper at that time. This holding technique is employed in order that a new owner or developer could not come in with uses that would not be compatible with the single family residences to the East and South of the subject property." Truman Esmond, another of plaintiffs' witnesses, in referring to a holding pattern observed, "Holding patterns are established in Zoning classifications to reserve for changes which will come from time to time as changing needs arise." The foregoing opinions suggest clearly the dual nature of property in a holding pattern and the discretionary nature of the decision to maintain or change the applicable zoning. Such a decision can hardly be regarded as arbitrary.

The transition between zones or areas of differing use intensities is one of the more difficult zoning problems, and the successful resolution of such problems depends in large measure upon whether natural or artificial divisions can be found or established which will prevent or at least minimize the effect of one zoning classification upon its neighbor. Streets, parkways, streams and railroad tracks have frequently been used as dividing lines. Since the property lying south and east of the intersection for a considerable distance is zoned for and presently occupied

by single-family residences, the streets bounding such area are a boundary between differently zoned areas. The effect of such dividing line will be lost or greatly diminished if changes are made in the zoning applicable to the corner property itself.

The second factor is the extent to which the value of the subject property is diminished by the limitations. There is no question that in most instances a change of classification from residential to commercial will bring about an increase in the value of the property. This is not disputed here. However, none of the plaintiffs' witnesses had any opinions concerning the value of the property either for its existing single-family use, its value under a general commercial classification or its value as a real estate office. Other than the plaintiffs' general claim for increased value it appears that whatever increase in value there is arises from the general opinion that property which may be used for commercial purposes is more valuable than that which may be used for only single-family residences. In large part this increase in value is both an inevitable and desirable result of zoning. The restricted use of large areas of real estate to residential use naturally enhances the value of nearby property for more liberal or less restrictive uses while at the same time maintaining and protecting the value of residential property. In the instant case the absence of evidence of diminished value as a consequence of the restriction offers little support for plaintiffs' claim of confiscation.

The next factor is the extent to which the removal of the limitation would depreciate the value of other property in the area. Plaintiffs presented three expert witnesses. The first witness testified, "A B-5 classification would improve neighboring property since such property is cannibalized by improvement." It is clear from this expert's testimony that what is anticipated in a situation such as the one at bar is that where the residential area begins to be zoned for commercial use the natural course of events is that the residential use value of the neighborhood is decreased. The statement that the commercial classification of the neighborhood would improve the property is based upon the premise that the rest of the property in the neighborhood would be reclassified for commercial uses and in such event their value would be increased. The issue here is whether the value of the neighboring property as residential property would be decreased. This is implicitly recognized in the foregoing testimony of the first expert witness. This same witness testified, "If property to the East of the subject property is classified as R-2, it would probably not be maintained and would depreciate." Again the fact is recognized that the value of the neighboring property as residential property would be decreased by the commercial use of the property

under examination. The second witness testified, "If the property on the South side of the subject property is reclassified commercially their homes would not depreciate in value." The third expert witness for the plaintiffs did not testify directly as to the possible depreciation in value of the neighboring residences. He did testify however that "[t]he livability of residences to the South and East of the subject property would not be diminished by B-5 usage of the subject property  *  *  *." Such opinion was based on the shielding effect of proposed landscaping and the location of the parking area as relating to the special use of the premises as a real estate office and did not indicate that the value of nearby residential properties would be preserved for their present use or that any general commercial use of the premises was justified.

From the testimony of the plaintiffs' experts several conclusions are indisputable. First, the lifting of the restrictions on the subject property by permitting a commercial use would substantially effect the properties lying east and south of the subject property. Second, such effect would be to substantially diminish or depreciate the value of such property for their present permitted and actual use for residential purposes. Finally, because of the effect and the injury to surrounding properties they would, according to these experts, be unable to continue their residential use and consequently should likewise be reclassified for commercial use which would then increase their value as and when the property was likely to be used for commercial purposes. As a consequence of this testimony I find there is no support for the finding in the trial court's order that nearby property would be benefited rather than damaged by the change in use of the subject property. I believe this conclusion is a distortion of how this factor should be applied to determine whether zoning is arbitrary or confiscatory. The opinions are generally speculative in that they assume that zoning restrictions on other properties will be changed because of a change in the zoning of the subject property, an assumption which is at best conjecture. Furthermore, the opinions are predicated upon the theory that changes in zoning with respect to the property involved in this litigation can and should affect property beyond the jurisdiction of the court. Again, because of its admitted effect on neighboring properties and the interdependence of the use of such properties with that involved in this case, the necessity of viewing the entire problem from the broader legislative discretion is evident. I am aware of no principle relating to the question of confiscation which permits the damage or injury to nearby properties to be ignored merely because the damage is so great that a change in zoning should result. I would also note that none of the witnesses offered any opinions con-

cerning how far the commercialization effect would extend or how the injury to residential uses could be limited.

The next factor is the suitability of the property for the zoned purpose. The facts relative to this factor shown by the evidence refute any claim of the confiscatory nature of the maintenance of the zoning restriction. The premises are improved with a single-family residence in accord with the applicable zoning, and such residence has been, and in so far as the evidence is concerned will continue to be, rented for the permitted use. While the expert witnesses tended to characterize a commercial use of the premises as being its highest and best use such opinions represent the transitional nature of the property and a belief that the continuance of the use of the property as a single-family residence is not economically justified. The conflicting inferences which the witnesses themselves revealed may be illustrated by the initial finding of the trial court which stated the "* * * highest and best use, economically, would be non-residental." The significance of this negative finding becomes apparent when considered in the context of other findings by the trial court and the testimony of the planners. Although the petition sought to have the property reclassified "B-5," the classification in which the proposed use was permitted, the court found that the uses permitted by such classification were not appropriate uses for the property involved. In effect the court was unable to say that the highest and best use of the property was commercial but only that such highest and best use was for some unspecified and limited nonresidential use. This limited and conditional view of the property is consistent with the testimony of the witnesses who were apparently unwilling to testify that the highest and best use of the property was for commercial purposes generally or for commercial purposes generally associated with the contemplated use.

The next factor is the existing uses and zoning of nearby property. This factor is adequately described regarding the discussion of the character of the neighborhood and need not be repeated.

The next factor is the length of time under the existing zoning that the property has remained unimproved considered in the context of land development in the area. It is undisputed here that the property under consideration is presently used for a single-family residence. It is also undisputed and was testified to expressly by one of plaintiffs that he has made no attempt to sell the property for single-family use.

The next factor is the relative gain to the public as compared to the hardship imposed upon the individual property owner. The most obvious hardship to the plaintiffs here is that the value of their property is less under this R-2 zoning classification. The gain to the public is that this

section extending east and south of the corner in question is used and planned by the Planning Commission of the municipality as a holding pattern against further commercialization of the area. Since the property lying south and east of the intersection is now presently occupied by single-family residences and since the value of such residences would be decreased so far as their residential use is concerned, the protection of such property values by maintaining the existing zoning restrictions would be of substantial value to the public. As indicated earlier, the degree to which the plaintiffs' property has been or will be depreciated by maintenance of the restriction is difficult to ascertain because of the absence of any testimony regarding the differing values of the property as affected by different zoning restrictions.

The last factor is the extent to which the present zoning ordinance promotes the health, safety, morals or general welfare of the public. In effect what this factor and all factors can be summarized to require is that there be a rational basis for the legislative ordinance. In the instant case the purpose of the Planning Commission maintaining the existing classification for this particular section as R-2 Residential is to form a holding pattern against further commercialization of the area and to maintain the residential nature of this section while encouraging further commercialization in the other three directions. It cannot be said as a matter of law that the municipality is forbidden from making such a determination. It is the function of the municipality, *i.e.*, a legislative function, to determine necessary and desired zoning classifications. It is not the function of the court to act as a super legislature imposing what they consider to be the best zoning plan for a particular locality. It is not the judiciary's function to judge the wisdom of a particular ordinance. It is merely the function of the court to determine whether the imposition of the particular zoning classification constitutes an unreasonable burden upon private rights. In the instant case it cannot be held as a matter of law that the classification in question constitutes such a burden. The record in the instant case taken as a whole does not support the holding of the trial court declaring the ordinance unconstitutional and enjoining its enforcement.

It may also be noted that the case relied upon by the majority, *Mutual National Bank of Chicago v. City of Chicago*, 26 Ill.2d 342, 186 N.E.2d 341, is not as much on point as appears from the majority opinion. A cursory reading of the majority opinion would give one the distinct impression that the *Mutual National Bank* case is almost on all fours with the case at bar. It is true that both cases concern residential zoning classification of one corner of an intersection where the other three corners were devoted to other than single family residential use. However,

in the *Mutual National Bank* case the classification desired was a change from single-family residential to multiple family dwellings. In the instant case the reclassification is from a single-family residential to a commercial usage. It is also of much significance that in the *Mutual National Bank* case the plaintiff, a real estate developer, testified he had made efforts to develop the subject property for single-family use by advertising in the newspapers and by showing prospective buyers some model houses which were located on other property and by telling these prospects that similar houses could be built on the subject property. In spite of these efforts he was unable to sell any of the property for single-family use. In the instant case plaintiff Kaszysnki testified he had made no effort to sell his property for single-family use.

In summary, I believe that when all the factors relating to the propriety of the ordinance are considered as a whole they amply demonstrate that the maintenance of the zoning restrictions is a matter of legislative discretion and do not refute the presumption of the validity of the ordinance. Such factors do not support plaintiffs' claim the ordinance is arbitrary or confiscatory as applied to their property but at best indicate only that the property might be enhanced in value to some unspecified degree if the restrictions were lifted. Although the question has not been argued in the briefs, it seems to me that there is substantial doubt whether any claim of arbitrariness or confiscation can be urged without at least a prima facie showing that restrictive covenants applicable to property are invalid or have been abandoned. I have some difficulty in believing that the maintenance of zoning restrictions can be deemed arbitrary when the sought for use would not be permitted even if the restrictions were deemed inapplicable.

For the foregoing reasons I feel the judgment of the circuit court of La Salle County should have been reversed and remanded for proceedings in accordance with this dissent.