ROBERT W. HAWS *et al.*, Plaintiffs-Appellees, *v.* THE VILLAGE OF HINSDALE, Defendant-Appellant.

Second District   No. 77-314

Opinion filed February 7, 1979.—Rehearing denied March 16, 1979.

Arthur C. Thorpe, of Klein, Thorpe, Kasson & Jenkins, of Chicago, for appellant.

S. Louis Rathje, of Rathje, Woodward, Dyer & Burt, of Wheaton, for appellees.

Mr. JUSTICE GUILD delivered the opinion of the court:

Plaintiffs Robert W. Haws, Ardyth E. Haws, Arthur W. Slaber and Mildreth B. Slaber are the owners of three adjacent parcels of land fronting on York Road in the Village of Hinsdale. They have contracted to sell this land, roughly 146' by 260', to the plaintiff McDonald's Corporation, contingent upon McDonald's being able to erect and operate a McDonald's restaurant on the land in question.

Plaintiffs filed a petition with the Village Board and the Planning Commission of the Village of Hinsdale to permit this land to be developed as a McDonald's restaurant pursuant to the amended zoning ordinance of the village. On November 4, 1975, the Village Board, concurring with the negative recommendation of its Planning Commission, denied the petition of the plaintiffs.

Plaintiffs brought a proceeding in the circuit court of Du Page County asking for injunctive relief and for declaratory judgment under section 57.1 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 57.1), contending: (1) that the amended zoning ordinance of Hinsdale was unconstitutional on its face, and (2) that even if constitutional on its face, the ordinance had been unconstitutionally applied in the denial of plaintiffs' petition.

The trial court agreed that the ordinance was unconstitutionally applied in denying the petition and ruled that plaintiffs should be allowed to consummate the contract to build and operate a McDonald's

restaurant. The trial court did not rule on the constitutionality of the ordinance itself. The village has appealed.

The Haws' bought their property in 1952. Since then they have used it as both a residence and as a base for Mr. Haws' rug cleaning business. While most of his work is done at others' homes, Mr. Haws does occasionally clean items in his own basement. The Slabers bought their property in 1941. Mr. Slaber ran a Jays Potato Chip distributorship from his home until his retirement in 1972. All three parcels were zoned commercial from the time it was acquired by plaintiffs until 1961. At that time the Village adopted a new comprehensive zoning ordinance which created a classification known as "F—Planned Development District."

The purpose of this district, as set forth in the ordinance, is as follows:
"All such planned developments are declared to possess characteristics of such unique and special form, such a large impact on the entire community, that each specific development shall be considered individually."

Various uses are permitted within the F district but "only upon presentation of a comprehensive plan of development to the Hinsdale Plan Commission and final approval by the Board of Trustees." As well as requiring specific requirements on matters such as parking and lot size, the ordinance also requires that:
"The proposed uses as presented must not:
1. Cause undue traffic congestion or create a traffic hazard.
2. Create dangerous or objectionable elements so as to adversely affect the character or property values of adjacent areas.
3. Impair the public health, safety, morals, convenience, comfort, prosperity and other aspects of the general welfare of the community."

Among the uses permitted in the F district once the above requirements were met are those allowed in C-1—Commercial Districts. A large number of commercial establishments, including restaurants, are permitted in C-1 districts in Hinsdale.

The village admits that the plans for the proposed McDonald's meet the specific requirements of the ordinance as to lot size, parking, etc., but contends that such a use would violate the three more general prohibitions enumerated above.

The trial court disagreed, finding that the McDonald's
"* * * would not adversely affect the traffic conditions along York Road; would not adversely affect the character or property values in the adjacent areas; would not adversely impair the health, safety, morals or convenience of the community, and would be compatible with the surrounding uses."

The property in question is on the east side of York Road

approximately 400' north of its intersection with Ogden Avenue. York Road is a major north-south roadway through the Village of Hinsdale. It is 40' wide with curb and gutters where it passes the subject property. Ogden Avenue is a four-lane east-west undivided highway with a traffic signal control at its intersection with York Road.

The property on the east side of York Road was utilized at time of trial as follows, going from south to north: an office building and parking lot (on the northeast corner of Ogden Avenue and York Road), the subject property, an auto body repair shop, a package liquor store and liquor warehouse, a vacant lot, and a parking lot for a nearby forest preserve. The liquor store with warehouse is in Oakbrook. All the other property on the east side of York Road is in Hinsdale.

The property on the west side of York Road north of Ogden Avenue was utilized at time of trial as follows, going from south to north: an Amoco gasoline station (on the northwest corner of Ogden Avenue and York Road), a vacant lot (directly across from the subject property), an office building and parking lot, a single-family residence and a vacant lot (directly across from the liquor store), and a Union 76 gas station. Like the liquor store, the Union 76 gas station is in Oakbrook.

Immediately east of the property is the office park of Hinsdale with six office buildings with approximately 200,000 square feet of space located on 54 acres of land. North of the office park is a recent condominium development on 47 acres of land, zoned F-1. Except for these F-1 condominiums and the Amoco gas station, which is zoned C-2, all of the Hinsdale property north of Ogden is zoned F. The commendable purpose of this zoning has resulted in a fine office and condominium area. The Graue Mill National Monument is located on the west side of York Road in Oakbrook, immediately to the north and west of this planned development district area.

The area south of Ogden Avenue near York Road is a mixture of retail businesses and professional uses, including a gas station on the southwest corner of Ogden Avenue and York Road and a combination gas station and car wash on the southeast corner, both zoned C-2.

Both the Haws and the Slabers have been attempting to sell their respective parcels without success for some time. Expert testimony introduced at the trial indicated that the combined parcels were worth $165,000-$200,000 if used for a McDonald's or other similar restaurants and $80,000-$133,000 if sold for other commercial uses.

Because we are affirming the trial court's ruling that the Hinsdale *Amended Zoning Ordinance* was unconstitutionally applied to plaintiffs' property, it is not necessary for us to make any ruling on the general constitutionality of the ordinance, and we will not do so.

■■ We thus turn directly to the trial court's ruling that the ordinance was

applied in an unconstitutional manner in this case. A zoning decision is unconstitutional if it has no substantial relation to public health, welfare or safety. The traditional tests under which a zoning determination is reviewed include, in general terms, the character of the neighborhood as shown by existing uses and zoning of nearby property, the extent to which surrounding property will be depreciated by the proposed use, the suitability of the subject property for the zoned purposes and the extent to which the destruction of the value of the plaintiff's property is required by considerations of the public interest in promoting the public health, safety and welfare of the community. (*Continental Homes of Chicago, Inc. v. County of Lake* (1976), 37 Ill. App. 3d 727, 346 N.E.2d 226.) The village contends that the proposed McDonald's failed to meet these traditional tests as they are reflected by the Hinsdale Amended Zoning Ordinance.

With regard to the sections of the ordinance prohibiting development that would "create dangerous or objectionable elements so as to adversely affect the character or property values of the adjacent areas" or "impair the public health, safety, morals, convenience, comfort, prosperity and other aspects of general welfare of the community," the village introduced testimony to the effect that the McDonald's would lower surrounding property values and also stressed the importance of preserving the area around the Graue Mill Monument and the possibility of other fast food restaurants following McDonald's into the area. The village's witnesses, however, admitted that a "full service" restaurant on the property in question would probably have been approved and indicated that the nearby body shop was a less desirable use than the proposed McDonald's.

Plaintiffs introduced testimony indicating a need for an inexpensive restaurant in the area, as well as testimony that the McDonald's would not negatively affect the surrounding property values.

■ Given the conflict in the testimony, it was clearly within the discretion of the trial court to rule that the McDonald's would not create dangerous or objectionable elements or impair the general welfare of the community. The property in question is near a body shop and a large package liquor store and several gas stations, as well as office buildings and condominiums. The immediate area along York Road has been, and remains, basically commercial and professional rather than residential. The F zoning allows for future commercial development. Indeed, the village admitted that this commercial development will occur but indicated a hope to "upgrade" the commercial use.

■ We have previously considered the application of this particular Hinsdale ordinance in *Gable v. Village of Hinsdale* (1967), 87 Ill. App. 2d 123, 230 N.E.2d 706. In that case we affirmed the trial court's judgment

that the ordinance of the village was arbitrary and unreasonable in its application to a piece of property at Ogden Avenue and County Line Road. The plaintiffs in *Gable* had entered into an option to sell their premises, zoned F, to an oil company for $100,000, contingent upon rezoning permitting the erection of an auto service station. We feel that the following comment by Justice Moran in *Gable* is equally applicable to the situation before us now.

> "Merely because the corporate authorities stamped the area as 'unique' does not make it so. To us it appears that the area was originally contemplated and zoned for business use and that it has developed for those purposes. In establishing a comprehensive amendment to a zoning ordinance the corporate authorities may not close their eyes to existing uses. The fact that this is done in a program to 'upgrade the area' adds no vigor to the argument." (*Gable v. Village of Hinsdale* (1967), 87 Ill. App. 2d 123, 128, 230 N.E.2d 706, 710.)

*Gable*, however, unlike the instant case, did not involve a potentially serious traffic problem.

■ At the outset of considering this traffic issue we must decide whether traffic problems, in and of themselves, can be a sufficient reason for denial of a particular use in a particular location. We believe that they can be. Although plaintiffs have cited cases which hold that traffic should not be given too much weight in zoning decisions (*La Salle National Bank v. Village of Skokie* (1962), 26 Ill. 2d 143, 186 N.E.2d 46; *Berger v. Village of Riverside* (1966), 69 Ill. App. 2d 148, 216 N.E.2d 479), these cases go only to the question of a general increase of traffic due to an increase in intensity of use. The instant case, on the other hand, involves not merely a general increase in traffic but, rather, a particular traffic problem connected to a particular use at a particular location, namely, the creation of a heavy volume driveway at this point on York Road. The village contends that such a driveway would not only result in increased traffic and traffic congestion but would also result in significant increase in traffic accidents due to the large number of cars that might attempt to make a left turn into heavy vehicular traffic on York Road. This type of traffic problem is not automatically a result of increasing development. Rather, it goes to the potential dangers of locating a particular kind of business at this particular location. It is our belief that local governments should be able to use their zoning powers to minimize such problems, whether it is with a specific traffic section of an ordinance or through a more general "health and welfare" section.

The trial court apparently agreed that a traffic problem could be used as a basis for denying plaintiffs' petition but made a factual finding that

the proposed McDonald's "would not adversely effect the traffic conditions along York Road."

It is undisputed that both York Road and Ogden Avenue are heavily travelled in the vicinity of the property in question. Plaintiffs' traffic expert, Mr. Zgonina, estimated that roughly 1133 cars passed the subject realty on York Road during the peak morning hour. During the afternoon peak hour the estimates of 1247 cars were slightly higher. The traffic on Ogden Avenue, east of the intersection with York, was even higher, with 1770 cars passing the intersection in the morning's peak hour and 2362 in the afternoon's. Defendant's expert witness, Mr. Box, gave similar estimates as to the traffic in the vicinity, his counts being only slightly higher than Mr. Zgonina's.

It is also undisputed that a McDonald's operating on the property in question would increase the number of cars using York Road near Ogden Avenue. Mr. Zgonina's estimate was that from 12 to 1 p.m. each day there would be 155 cars coming into McDonald's and 150 leaving, and from 5:30 to 6:30 p.m. there would be 110 cars entering and 105 leaving the proposed McDonald's. Of these cars, 60 percent, according to Mr. Zgonina, would be from cars already on the street system and 40 percent would be traffic actually generated by the McDonald's. Mr. Box testified that McDonald's restaurants on the average were the greatest driveway traffic generater on a square foot basis of any retail business use. He also testified that the number of accidents per year related to McDonald's restaurants was considerably higher than for other fast food restaurants, as well as higher than for other types of uses.

The primary factual disputes as to traffic have centered on three issues: first, whether cars would be able to safely make left turns south onto York Road from the property in question; second, whether the village had, in fact, contributed to the traffic congestion by allowing other parcels to be developed without regard to the traffic consequences; and third, that the village could easily alleviate whatever traffic problems might result from McDonald's.

With regard to the issue of whether autos leaving the McDonald's would be able to safely make left turns onto York Road, both sides relied heavily on observations of gaps in the traffic on York Road, a gap being a space in the flow of traffic allowing a turning vehicle to enter that flow. Both sides agreed that the most severe traffic problems would occur during the overlapping of the evening rush hour with McDonald's dinner business. Mr. Zgonina testified that a 7-second gap in traffic was necessary to allow the left turn in question. A study conducted by him showed 42 gaps of 5 seconds or greater, averaging 13.14 seconds, between 5 and 5:15 p.m. on the date of the study; 31 gaps of 7 seconds or greater, averaging

11.48 seconds, between 5:15 and 5:30 p.m.; 32 gaps of 7 seconds or greater, averaging 11.62 seconds, between 5:30 and 5:45 p.m. and 52 gaps of 7 seconds or greater, averaging 12.78 seconds, between 5:45 and 6 p.m. This gap study was based on the assumption that a car turning south onto York Road would require only three lanes to be clear of traffic, the two northbound lanes that had to be crossed and the near, inside southbound lane to pull into. Thus Mr. Zgonina's study did not take into consideration any traffic that might be in the outside, southbound lane.

Ardyth Haws, one of the plaintiffs, testified that she had successfully made the left turn onto York Road from her property on a daily basis during the 4:30 to 5:30 p.m. period and had also watched cars turning both directions from the office building directly across the street during that period.

Mr. Box's gap study produced radically different results. He testified that on the day of his study from the period from 4:30 to 5:30 p.m. there were no gaps for southbound traffic exiting from the proposed McDonald's site to York Road of a suitable length. Mr. Box said that in order for there to be a gap for a left turn the gap must exist for a 6-second interval in both southbound lanes as well as in both northbound lanes because, in his estimation, it was very dangerous for a driver to turn into a 10-foot-wide lane from a driveway when there were vehicles travelling in the lane next to it.

Mr. Box also conducted a study of the traffic queues in front of the subject property. He defined "traffic queue" as a checking of the backup of the traffic at various points from a control, usually a traffic signal, and the length of time that a given point is blocked for right turn exit or left turn exit. He found that during the evening rush hour the driveway points of the subject property were blocked from 61% to 94% of the time for a left turn.

There was some indication that McDonald's would be willing to put up a NO LEFT TURN sign during the evening rush hour to prevent customers from turning south onto York Road, but defendant questioned whether such a prohibition would be obeyed.

Mr. Zgonina concluded that the traffic volumes to be generated by, and driveway volumes from the proposed McDonald's were "negligible in regard to what traffic is already on this street," and that the proposed McDonald's "would not increase or cause any undue traffic congestion on York Road."

Mr. Box, however, concluded that, in his opinion, the proposed McDonald's "will result in a substantial major increase in traffic hazard—a major increase in the number of accidents and some increase in congestion in the immediate area of the driveways" and "will seriously interfere with traffic flow on the highway itself."

None of the witnesses, including Messrs. Zgonina and Box, knew of any accepted national definition for "undue traffic congestion."

█ Both parties introduced evidence on the issues of whether the village had helped create the traffic congestion by indiscriminately approving other high traffic generating uses and whether this congestion could be alleviated by changing the timing of the traffic at the Ogden intersection for left turn or by improving the roads. As the trial court made no specific findings on these issues, it is not necessary for us to comment upon them here, and we will not do so.

██ █ The trial court apparently relied strongly on Mr. Zgonina's studies and conclusions in finding that the proposed McDonald's would not create significant traffic problems. We cannot hold that, as a matter of law, he was incorrect in doing so, particularly in view of the lack of any accepted definition of how much traffic congestion is "undue." It is not our duty to make our own independent factual conclusion on this issue, but only to determine whether the trial court's finding was against the manifest weight of the evidence. (*John J. Calnan Co. v. Talsma Builders, Inc.* (1977), 67 Ill. 2d 213, 367 N.E.2d 695; *Ray v. Winter* (1977), 67 Ill. 2d 296, 367 N.E.2d 678.) We recognize that a presumption of validity attaches to the zoning ordinance and that if such an ordinance is reasonably debatable it should be upheld. (See *Whittingham v. Village of Downers Grove* (1968), 101 Ill. App. 2d 166, 242 N.E.2d 460.) However, the trial court was in the best position to sift and weigh the massive amount of technical testimony, much of it contradictory, on this traffic issue in order to decide whether this presumption of validity had been overcome. There was sufficient evidence to decide it had been.

For the reasons stated herein, we affirm the decision of the trial court.

Affirmed.

NASH and RECHENMACHER, JJ., concur.