AMCON CORPORATION and O–J
Sporting Goods Company,
Appellants,

v.

CITY OF EAGAN, Defendant and
Third-Party Plaintiff, Respondent.

No. CO–83–935.

Supreme Court of Minnesota.

April 20, 1984.

Luther M. Stalland, Minneapolis, for appellants.

Paul H. Hauge, Eagan, for respondent.

AMDAHL, Chief Justice.

Plaintiffs appeal from an order and a judgment of dismissal entered on May 17, 1983, by the Dakota County District Court after having heard arguments of counsel and reviewed affidavits, files, records, and proceedings generated by plaintiffs' efforts to obtain rezoning of their property by defendant, City of Eagan (city).

The procedural development of this case has been exceedingly protracted and complex, but a recital of its history is essential to understanding the current postures of the parties. The original application for rezoning filed by Amcon Corporation and O–J Sporting Goods Company on September 23, 1981, was denied by the city on August 3, 1982. Plaintiffs then commenced an action in Dakota County District Court for declaratory relief or, in the alternative, damages in the amount of $5,000,-000 for an unconstitutional taking.

The city commenced third-party proceedings against the State of Minnesota, Department of Transportation, Commissioner of Transportation (hereafter MnDOT), and the Metropolitan Airports Commission (hereafter MAC), alleging that various omissions by these agencies had placed the city in a position of potential liability and that these agencies were therefore required to indemnify the city for any damages assessed against it.

By order of February 11, 1983, the trial court granted the motions of third-party defendants to dismiss the third-party complaints for failure to state a claim upon which relief could be granted.[1] The motion

---

1. The Eagan City Council was initially concerned that the height of the new buildings would exceed the regulations proposed by MnDOT and pose an aircraft safety hazard. Plaintiffs' land fell within Safety Zone B which according to 14 MCAR 1.3010 was within an area where uses such as hotels and motels were specifically prohibited. MAC had not yet adopted these regulations but MnDOT representatives had apparently warned the city of potential liability ramifications.

On February 24, 1983, the Minneapolis-St. Paul International Airport Joint Zoning Board resolved to reduce the scope of Zone B due to the improved technology of aircraft and noise controls, review of accident statistics and the nature of the terrain, and consideration of the

for summary judgment on behalf of the city was denied in the same order.

The Eagan City Council subsequently agreed on March 1, 1983, to grant a planned development (PD) zoning classification to plaintiffs, but plaintiffs contended that an underlying roadside business (RB) classification was a necessary concomitant to the supplementary PD zoning. After a hearing held on March 3, 1983, the trial court concluded that RB zoning is not necessary to effectuate PD zoning and that, because plaintiffs had not requested RB zoning prior to the declaratory judgment action, the issue was not properly before the court. The action was dismissed. Plaintiffs appeal from the lower court's denial of their request for a court order requiring the initiation of RB zoning for plaintiffs' land.

We conclude that the question as to whether planned development zoning requires a concomitant underlying rezoning is properly before this court on appeal. EAGAN, MINN. Code § 11.20, subd. 8 (1983) (hereinafter cited as Code) is ambiguous as to whether planned development zoning should be granted only when supplementary to an underlying classification. Because we conclude that on both policy and factual grounds this is the better rule, we reverse and remand to the district court to direct the city council to accomplish an underlying reclassification.

Plaintiff O–J Sporting Goods is an Illinois corporation qualified to do business in Minnesota and is the owner of 20 acres in the city of Eagan. Plaintiff Amcon Corporation is a Wisconsin corporation also qualified as a foreign corporation to do business in Minnesota. Plaintiffs plan a joint venture to develop the property, originally zoned as agricultural (A), into a high-rise hotel-office building complex. Their application for rezoning provided for two multistory office buildings and a 225-room hotel at a projected cost of between $30 and $40 million dollars.

Plaintiffs claim their rezoning application was a request for a change from agricultural to planned development with an underlying roadside business classification in case the planned development was not granted. The city claims that no application for roadside business was ever received and that the initial request was only for a PD designation. The applications themselves, both the original and the reapplication of May 7, 1982, are silent as to which classification was requested. Plaintiffs contend that the zoning ordinance requires an underlying commercial zoning of RB with an overlaying PD zoning but that the staff personnel of the city incorrectly advised plaintiffs not to pursue a roadside business designation.

The city declares that the issue of roadside business zoning did not arise until a week before the hearing on the declaratory judgment action and that all the proceedings to date have dealt solely with planned development.

Code § 11.20, subd. 8 (1983), describes the purpose and intent of the planned development district as being—

> [S]upplementary to *all* other zoning districts contained in this ordinance, the purpose of which is to encourage, under appropriate circumstances, a more creative, varied and efficient use of residential land in Eagan township. Where such supplementary zoning is approved *it shall be deemed supplementary and superimposed* over the *basic* zoning of the property under consideration * * *.

(Emphasis added). Applicants for PD zoning must submit a detailed "preliminary plan with data, drawings, exhibits, plans, specifications, time projections * * * finan-

regulations of other agencies including the Federal Aeronautics Administration.

The city council, on March 1, 1983, adopted a motion unanimously supporting a bill presented to the 1983 legislature by MnDOT allowing deviations from minimum zoning standards. Plaintiffs' property was no longer within Zone B; hence the city council no longer had reason to deny plaintiffs' application for rezoning. The city council offered to rezone from A, agricultural, to PD, planned development, if plaintiffs would dismiss the then pending declaratory judgment damage action.

cial information and any other materials that the Advisory Planning Committee and/or the Board of Supervisors shall deem necessary and appropriate * * *." The Advisory Planning Committee then reviews the applications to determine if the PD will

> (a) better adapt itself to its physical and esthetic [sic] setting and that of surrounding lands than does development of the *underlying* zoning district; (b) be feasible for the owner and developer economically to complete according to proposed plans; and (c) benefit the community at large to a greater degree than would development of the *underlying* zoning district.

(Emphasis added). No building permit will be issued without approval of the PD application. Upon approval and prior to construction the applicant must submit detailed final plans. If the PD zoning is approved but the application fails to comply with the approved plans, as determined upon an annual review, the superimposed planned development zoning will be revoked and "the land area within the planned development shall automatically revert to its prior *basic* zoning classification." Eagan City Code § 11.20, subd. 8. (Emphasis added).

Code § 11.20, subd. 3(a)(b) (1975), describes the permitted, conditional, and accessory uses of a parcel that is zoned agricultural. These basically include only agricultural pursuits and residential dwellings with no provision for any commercial activity that is not agriculturally related.

The permitted conditional and accessory uses within a roadside business district include a motel or hotel but apparently do not allow the construction of a multistory office complex.[2]

**2.** The permitted accessory uses under Eagan City Code § 11.20, subd. 14(D) (1983), include all accessory uses permitted "in any other Commercial District." We have been unable to ascertain if office buildings fall within this allowance. Defendant and plaintiffs alike are clearly under the impression that two such high-rise office towers would not qualify as a permitted accessory use in an RB district.

A comprehensive guide plan has been adopted by the city. The accompanying maps approved by the city council on January 22, 1974, and in February 1980 designate plaintiffs' property as roadside business.

The comprehensive guide plan states that it is—

> [M]eant to serve as a guide and as such, should possess a degree of flexibility * *. Deviations, however, should not be justified solely on the grounds that the comprehensive plan is only a guide and is meant to be flexible. Where deviations are proposed by developers and others, the burden of proof * * * should be the responsibility of the person or persons proposing the revision.

Plaintiffs argue that to be consistent with its comprehensive plan the city must grant the underlying RB designation. The city claims that its code contains no such requirement.

■ Both parties agree that the language of the planned development zoning ordinance Code § 11.20, subd. 8 (1983), which refers to "underlying" districts, "original" districts, and "basic" districts is undefined and ambiguous.[3] Prior history and the intent of the drafters is therefore relevant to ascertain the true meaning of the statute. The city cites a proposal in 1970 which defined "original" districts as a district "other than a planned development district" and concludes, citing to the ordinance, that "[b]asic zoning is the zoning in existence at the time that the planned development application is submitted." But Code § 11.20, subd. 8 (1983), contains no such definition.

The city insists that it has never granted new underlying classifications where PD zoning has been granted. Plaintiffs, on the

**3.** Actually the city argues that "the wording of the relevant portion of the zoning ordinance is clear" but, in proceeding to outline the prior history of the ordinance, the city undercuts this position.

other hand, present affidavits and depositions of persons who were involved with the drafting of the ordinance at issue. John Voss is a city planner who has worked for three Twin Cities municipalities and is now an independent consultant for the city. According to Voss, originally all of the land in the city was classified as A, agricultural, a zoning that was intended as a "holding" or a "nonzone" until a more specific classification was made.[4]

John J. Klein is a real estate broker in the city who served as chairman of the Eagan Town Board in 1970 when the first planned development district was included in what was then Eagan Zoning Ordinance No. 6. Klein claims that "[t]he PD was never contemplated to be supplementary or superimposed over A, agricultural lands, a nonzone classification. All land * * * at the inception of the first zoning ordinance was classified as A unless there already existed concentrated residential, or commercial or industrial uses * * *. Thereafter lands were zoned to a *basic* zoning classification of residential, commercial, or industrial. When PD was applied for, at that time we established the underlying zoning for the PD, predicated upon the proper use of the land." (Emphasis added).

Additionally, Luther Stalland, the attorney for plaintiffs who was the city attorney who drafted many of the proposed planned development ordinances, insists that the "underlying philosophy of the city's zoning ordinance and Comprehensive Guide Plan [was that] there would be basic zoning consisting of a classification, such as commercial, upon which PD is overlayed * * * if the development is basically commercial."

John Shardlow, a professional land planning consultant for the city of Burnsville, whose firm is the consultant for Mendota Heights and Roseville, asserts that it is the customary practice in those cities "to grant an underlying zone which provides the minimum use applicable to the PD, together with the overlaying PD zoning."

In support of their claim that the agricultural zoning classification is meant to be a holding zone, plaintiffs describe the property as not suitable for residential purposes because it is surrounded by a major freeway (Interstate No. 494), a major road (Pilot Knob Road), and commercial and light industrial districts, and has a very high noise level by reason of being beneath the aircraft approach onto runway 29L. The property is not suitable for agricultural purposes because it is largely treed, sloping, and has a ravine running through it. Plaintiffs have been paying real estate taxes based on a commercial property designation by the Dakota County Assessor. Hence, plaintiffs argue, the underlying RB zoning (which would allow the planned hotel and restaurant) is the most appropriate basic classification for their property.

As a general rule a party who is seeking rezoning must first exhaust the administrative remedies available before bringing an action for judicial relief unless the remedies are inadequate or nonexistent. 8A E. McQuillan, Municipal Corporations, § 25.283 (1976). The city claims, and the district court agreed, that an application for RB zoning has never been submitted by plaintiffs, has never been formally rejected by the city council, and therefore cannot be appealed. But the city acknowledges that the city council has not "as a matter of practice" changed the underlying zoning in cases where a request for planned development zoning has taken place. The city council also forcefully states that appellants have never been advised by the city staff that such underlying rezoning would be allowed. The inevitable conclusion is that the city has no intention

---

**4.** Plaintiffs misstate the deposition testimony of planning consultant Voss when they assert that he stated "the intent was to overlay PD only on basic zoning classifications other than A * * *." In fact, Voss does not address PD zoning at all in the only portion of the deposition that is part of the record. But the lack of any comment on the subject does not support the city's contention either that the council has not, as a matter of practice, changed the underlying zoning in cases where a request for planned development zoning has taken place. The city has produced no affidavits or depositions to prove this statement.

of ever allowing both classifications at the same time. In *McShane v. City of Faribault*, 292 N.W.2d 253 (Minn.1980), this court declared that "[w]e have consistently held that administrative remedies need not be pursued if it would be futile to do so." 292 N.W.2d at 256. (Citations omitted). Other jurisdictions have taken the same approach. The Illinois court in *Bass v. City of Joliet*, 10 Ill.App.3d 860, 295 N.E.2d 53 (1973), refused to apply the exhaustion of remedies rule "where the demonstrated attitude of the local authorities makes it clear that administrative relief * * * will not be forthcoming." 10 Ill.App.3d at 865–66, 295 N.E.2d at 56. (Citations omitted) We will not require plaintiffs to reapply to the city council for an RB zoning designation when to do so would be futile.

■ Although the initial zoning application mentioned no specific zoning category, it is clear that at least since suit was filed in this case, the city has had knowledge that plaintiffs wished to have both the RB and the PD classifications granted. The roadside business designation was duly considered and rejected and was properly before the district court. Additionally, the trial court's conclusion that a planned development zoning did not require a concomitant underlying rezoning effectively decides the issue. The question is therefore properly before us on appeal.

■ The general rule in Minnesota is that where a municipality acts in its fact-finding or legislative policymaking capacity under its delegated powers the scope of review is very narrow, "subject only to the broad limits of the 'arbitrary and capricious' standard * * *." *Frank's Nursery Sales, Inc. v. City of Roseville*, 295 N.W.2d 604, 608 (Minn.1980). Further, "[a]s a legislative act, a zoning or rezoning classification must be upheld unless opponents prove that the classification is unsupported by any rational basis related to promoting the public health, safety, morals, or general welfare, or that the classification amounts

to a taking without compensation." *Rochester Association of Neighborhoods v. City of Rochester*, 268 N.W.2d 885, 888 (Minn.1978).

■ But we have also stated that "the interpretation of an existing ordinance is a question of law for the court." *Frank's Nursery*, 295 N.W.2d at 608, *citing* 3 Rathkopf, The Law of Zoning and Planning, ch. 65, § 3 (4th ed. 1979). In interpreting the zoning ordinance at issue, this court will generally construe strictly against the city and in favor of the property owner. *Id.*, *citing* 3 Anderson, American Law of Zoning § 16.10 (2d ed. 1977); 1 Rathkopf § 9.03. In the instant case, however, we are not reviewing the city's interpretation of its zoning ordinance. Essentially, this court is confronted with a policy determination by the city that it will never grant an underlying zoning classification along with planned development zoning and therefore the higher standard of review applies. We must determine if the city has abused its discretion and acted arbitrarily and capriciously and in "opposition to the intent and policy of the statute and or the ordinance adopted conformably to its provision * *." 8A McQuillan § 25.310 at 416. Other jurisdictions, particularly Colorado, have applied this standard of review specifically to planned development zoning. *See Moore v. City of Boulder*, 29 Colo.App. 248, 252, 484 P.2d 134, 136 (1971) (zoning ordinance classifying land from residential to planned development is a legislative act presumed to be valid and reasonable). *Accord Dillon Construction v. City of Boulder*, 183 Colo. 117, 515 P.2d 627 (1973).

A. Policy behind planned development districts.

■ Zoning ordinances should always be considered in light of their underlying policies. *Lowry v. City of Mankato*, 231 Minn. 108, 42 N.W.2d 553 (1950). Planned development zoning is a modern non-Euclidean [5] concept which seeks to meet cur-

5. The term "Euclidean" zoning is taken from the landmark United States Supreme Court case of

*Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), in which

rent needs and also permit adjustment to changing demands by allowing a use which does not correspond to those permitted in any single type of district. 2 Anderson § 11.09 at 358. The uses allowed "must be in harmony with the surrounding neighborhood, must not jeopardize or reduce zoning standards in the area and should promote the general welfare of the community * * [T]he use and method * * * are strictly limited to the plan presented to and approved by the City Council." *Moore v. City of Boulder,* 29 Colo.App. 248, 251, 484 P.2d 134, 135 (1971). Planned development usually involves a single use on a relatively small tract. The biggest problem is the possibility of "spot zoning." [6] The planned development district does not appear on the initial zoning map of a municipality but regulations authorize its future creation. 2 Anderson § 11.09 at 360. The necessity of filing plans with the planning commission, which reviews them and transmits a recommendation to the legislative authority which decides whether or not to create a PD district, is all calculated to insure the surrounding land is protected and the PD is consistent with a comprehensive plan. The ordinance authorizing the PD district's creation must articulate sufficient standards to guide and contain the discretion of the agency and to facilitate meaningful judicial review. 2 Anderson § 11.10 at 361.

There are just a few cases addressing planned development nationwide.[7] In each of those cases, PD is treated much like any other zoning classification and no *underly-*

*ing* district is mentioned. *See Dillon v. City of Boulder,* 183 Colo. 117, 515 P.2d 627 (1973) (denial of request to rezone from agricultural to PD was upheld); *Haws v. Village of Hinsdale,* 68 Ill.App.3d 226, 386 N.E.2d 122 (1979) (rezoning from commercial to F, planned development, found arbitrary and capricious and not justified by public welfare); *Teer v. Duddlesten, supra* note 6 (classification of specific tract of land as PD which permitted combined uses for office and light retail districts upheld against "spot zoning" challenge); *Accord Gable v. Village of Hinsdale,* 87 Ill.App.2d 123, 230 N.E.2d 706 (1967).

In *Moore* planned development was differentiated from other types of rezoning. The Colorado court stated that when a property owner obtains a classification to a broad category such as business the land can be used for a multitude of permitted purposes but PD zoning is much more restrictive. 29 Colo.App. at 251, 484 P.2d at 135.

The averred practice of the cities of Burnsville, Mendota Heights, and Roseville of granting an underlying classification along with PD zoning is not reflected in existing case law but the precise issue has never been addressed. Certainly the property owner who is given both rezoning classifications is in a more favorable position than the one whose investments and planning are wholly at the mercy of approval or rejection by the city council. Appellants clearly want a "back-up zoning

zoning was first sustained as a constitutional exercise of the police power. The zoning plan upheld in *Euclid* contemplated, rather than case-by-case zoning, cumulative uses in a pyramid-type configuration. "The uses permitted in the more restricted districts were permitted also in the less restricted districts." 1 Rathkopf, The Law of Zoning and Planning § 1.01, 1–9 (4th ed. 1975). Residential use was considered the highest (*i.e.,* most restrictive) use but was also permitted in the commercial and industrial districts. The major problem caused by the rigidity of Euclidean zoning is that it permits uses having very different characteristics within the same district and disallows some combinations of uses which are desirable in a changing society.

6. Spot zoning is the reclassification of a small area of land in a manner that is not compatible with the surrounding neighborhood for the benefit of the property owner and to the detriment of others. 2 Rohan, Zoning and Land Use Controls § 13.01[2] (1978). It is preferential treatment, piecemeal zoning, the antithesis of planned zoning. *Terr v. Duddlesten,* 641 S.W.2d 569 (Tex.App.1982).

7. Minnesota addressed the concept in *Inland Construction Co. v. City of Bloomington,* 292 Minn. 374, 195 N.W.2d 558 (1972), but the ordinance at issue defined planned developments as a conditional use and the court treated the case as involving a "special use" permit. Such is not the case with the Eagan ordinance.

classification" as the city claims. The city obviously maintains greater control over the use of the land with the granting of only a PD classification. But if, as the city states, it would by law have to be responsive to a request for rezoning in light of its comprehensive guidelines, it is difficult to conceive a reason why the city would not be willing to grant the RB classification at the outset rather than requiring future applications and possible litigation. The city has advanced absolutely no reason for the denial of RB zoning except to say it does not conform with the council practices and is not required under the city code. If the proposed plans are rejected or if they fail somehow, plaintiffs have no recourse but to begin again with new plans and thousands of dollars in legal expenses.

B. Relationship of PD zoning to the comprehensive plan.

■ The essence of constitutional zoning with no due process or equal protection problems is generally recognized to be demonstrated by the existence of a plan which uniformly, without discrimination and without unreasonable restrictions, promotes the general welfare. "It is the basic instrument of municipal land use planning." 1 Rathkopf, § 12.02 at 12–5. Recent revisions in the zoning-enabling acts of states such as California, Florida, Kentucky, Michigan, Nebraska, and Washington require that the ordinance and all amendments be drawn in accordance with a comprehensive plan.[8] Courts have held that "failure of an amendment to conform to the previously existing comprehensive plan results in invalid spot zoning." *Id.* at 12–6. Such a provision has been required to avoid arbitrary or capricious exercise of the zoning power and reduce the impact of growing restrictions on the right of owners to make free use of their land.

■ Minnesota's municipal planning act, Minn.Stat. §§ 462.351–.364 (1982), provides for the optional adoption of a comprehensive plan; "[a] municipality * * * *may* prepare, adopt and amend a comprehensive

municipal plan and implement such plan by ordinance and other official actions * * *." Minn.Stat. § 462.353, subd. 1 (1982) (emphasis added).

■ Under the Metropolitan Land Use Planning Act, Minn.Stat. §§ 473.851–.872 (1982), however, Dakota County and the city of Eagan were required to prepare and submit to the Metropolitan Council for approval a comprehensive land use plan containing objectives, policies, standards and programs to guide public and private land use. *See* Minn.Stat. §§ 473.859, subd. 1, .872 (1982). Each local government unit is also required to adopt "official controls", *i.e.,* ordinances and regulations which implement the general objectives of the comprehensive plan and which *may* include ordinances establishing zoning. *See* Minn. Stat. §§ 473.865, .852, subd. 9 (1982). The comprehensive guide plan submitted by the city of Eagan and approved by the Metropolitan Council during the course of this litigation specifies that the plan is meant to serve as a guide and should possess a degree of flexibility. Moreover, Minn.Stat. § 473.865, subd. 3 (1982), only requires amendment of any ordinances which *conflict* with the comprehensive plan. The city of Eagan argues that PD zoning does not conflict with its comprehensive plan in this case because PD zoning does not preclude eventual RB designation. Whether or not there is such a direct conflict as to mandate amendment of the ordinance is not determinative for the purpose of appellate review of the city's refusal to grant both designations.

■ The designation of land uses on such a master plan is generally viewed as advisory and the city is not unalterably bound by its provisions. However, the recommendations should be entitled to some weight, particularly where the plan has been adopted by the legislative body although not implemented. *See Sharninghouse v. City of Bellingham,* 4 Wash.App. 198, 203, 480 P.2d 233, 236 (1971).

8. See 1 Rathkopf, § 12.04 at 12–29 for citations     to the particular statutes.

■ The city's own comprehensive plan and map designate the property at issue as roadside business. While this designation is not binding, a refusal to zone accordingly is evidence that the city is acting in an arbitrary manner. Commentators have noted that a common objection to zoning flexibility devices is that their administration is subject to so many varied pressures that a curb on their discretionary use is essential. Note, *The Administration of Zoning Flexibility Devices: An Explanation for Recent Judicial Frustration,* 49 Minn.L.Rev. 973 (1965). Recent cases have emphasized even more the comprehensive plan aspect as a hedge against "special interest, irrational *ad hocery.*" *Town of New Bedford v. Village of Mt. Kisco,* 33 N.Y.2d 178, 188, 351 N.Y.S.2d 129, 136, 306 N.E.2d 155, 159 (1973) (emphasis in original).

In *Marino v. Zoning Hearing Board of Harrison Township,* 1 Pa.Cmwlth. 116, 274 A.2d 221 (1971), the Pennsylvania court believed that comprehensive plans were "neither absolute nor inviolate." 1 Pa. Cmwlth. at 122, 274 A.2d at 224. Nonetheless, the court ruled that "flexible selective zoning ordinances which rezone on a case-by-case method and which are not enacted in accordance with a comprehensive plan are invalid." *Id.* at 121, 274 A.2d at 223. (Footnote omitted)

■ The failure of the city to advance any rationale for not following its comprehensive plan and not granting the RB classification is strong evidence of arbitrary action. In *Dillon* the Colorado court overturned the denial of an application for rezoning because there was no evidence to support the denial. This court, in *Inland Construction,* stated that under *Zylka v. City of Crystal,* 283 Minn. 192, 167 N.W.2d 45 (1969), the failure of the council to articulate "any legally sufficient basis for its determination made a prima facie showing

of arbitrariness inevitable." 292 Minn. at 392, 195 N.W.2d at 569.

In *Rochester Association,* this court refused to require that a zoning ordinance conform exactly to a land-use plan when adopted or to shift the presumption of validity which attaches to all rezonings even those that are inconsistent with a comprehensive plan. 268 N.W.2d at 889. The court pointed out that Minn.Stat. §§ 462.-351–.364 (1976) does not require conformance to the land-use plan.[9] But in that case, the Rochester City Council had amended the land-use plan after amending the zoning classification, thus indicating an intent to alter the basic plan. In the case at bar, however, the city had indicated no intention of changing the land-use plan. Indeed, the city states that if the planned development plans fail, the developer can always come back and reapply for a roadside business classification.

■ The ordinance is vague and equivocal as to what "basic" zoning means. The city's own comprehensive plan designates the property as RB. Refusing to grant an underlying rezoning is inconsistent with the zoning practices of neighboring cities. The parcel of land is not suitable for agricultural or residential use and plaintiffs have been paying commercial real estate taxes. Under these particular facts, the refusal to grant an underlying RB rezoning without stating any justification for the refusal is arbitrary and capricious action.

We therefore remand to the Dakota County District Court for the issuance of an order directing the Eagan City Council to grant plaintiffs an underlying rezoning from agricultural in addition to the planned development zoning already granted.

Reversed and remanded.

---

9. The particular statutory language at issue here has not changed since 1976. *Compare* Minn. Stat. §§ 462.351–.364 (1976) *with* Minn.Stat. §§ 462.351–.364 (1983). But Minn.Stat. §§ 473.-

851–.872 (1982) did not apply in that case. The city of Rochester is in Olmsted County which is not covered by the Metropolitan Government Act.