2020 IL App (2d) 190368-U
No. 2-19-0368
Order filed February 11, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE CATHOLIC BISHOP OF CHICAGO, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17-MR-1013 |
| | ) | |
| THE VILLAGE OF LIBERTYVILLE, | ) | Honorable |
| | ) | Michael J. Fusz, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Birkett and Justice Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's findings in support of its order overturning the defendant-village's decisions with respect to a proposed residential development were not against the manifest weight of the evidence. The defendant forfeited a defense that it failed to raise at trial and raised for the first time at a hearing on a motion for reconsideration in the trial court. Such defense was also barred by the invited-error doctrine.

¶ 2    Plaintiff, the Catholic Bishop of Chicago (the Archdiocese), filed an action in the circuit court of Lake County challenging multiple decisions made by defendant, the Village of Libertyville (Libertyville), with respect to a proposed residential development. Following a bench trial, the court ruled in the Archdiocese's favor. Libertyville appeals. For the reasons that follow, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4     The Archdiocese owns an 800-acre plot known as the University of St. Mary at the Lake Seminary. Portions of the seminary are in Libertyville, and other portions are in the Village of Mundelein (Mundelein). The subject of this lawsuit is an undeveloped 40-acre tract of the seminary which abuts Butterfield Road, a four-lane county highway, in Libertyville (the subject property). The subject property is zoned as an "Institutional Building."

¶ 5     Immediately adjacent to the subject property is a portion of the seminary in Mundelein that the Archdiocese leases to the Pine Meadow Golf Club. Patrons may access that golf course via Pine Meadow Lane, which connects to the intersection of Butterfield Road and Lake Street. Butterfield Road and Lake Street is a busy intersection that does not have a traffic light, although such light would be warranted.

¶ 6     Around 2010, the Archdiocese laid the groundwork to eventually sell the subject property for residential development by applying for an amendment to Libertyville's Comprehensive Plan. The Comprehensive Plan sets forth Libertyville's long-term goals and policies with respect to properties; it is not the official zoning code. Libertyville approved the Archdiocese's application, passing an ordinance amending the Comprehensive Plan to reflect that 33 acres of the subject property would be deemed "mixed medium density residential." Libertyville limited the density of any development plan to 191 dwelling units.

¶ 7     In 2014, the Archdiocese contracted to sell the subject property to Roanoke[1] for $15 million to develop a residential subdivision. The contract was contingent on Roanoke obtaining all

_____

        [1] Although there were multiple related corporate entities involved, for the sake of simplicity we will refer to the developer as Roanoke.

necessary governmental approvals.

¶ 8     In March 2016, Roanoke submitted an application (the original application) to Libertyville requesting: (1) an amendment to the Comprehensive Plan to change the designation of the remaining seven acres of the subject property to "mixed medium density residential," (2) rezoning of the subject property to "R-6 Single Family Residential," (3) approval of a preliminary plat of subdivision, (4) a special use permit for a planned development, and (5) approval of a planned development concept plan. The original application contemplated an access road (the proposed access road) from the development directly onto Butterfield Road. The original application also proposed a secondary access point at Butterfield Road and Lake Street by connecting the development to Pine Meadow Lane through the golf course.

¶ 9     The Archdiocese expressed its unwillingness to go forward with the secondary access after Mundelein requested certain changes to the proposed configuration of that access. In the Archdiocese's judgment, the secondary access would be too costly and would disrupt golf course operations. Roanoke thus revised its application in September 2016 (the revised application), reducing the number of dwelling units from 157 to 148 and eliminating the secondary access through the golf course.

¶ 10     Roanoke commissioned Kenig, Lingren, O'Hara, Aboona, Inc. (KLOA) to perform a traffic impact study. KLOA analyzed the effects of constructing the proposed access road, which would be unsignalized and would now serve as the sole access to the development. In this context, "unsignalized" meant that there would be no traffic light at the proposed access road's intersection with Butterfield Road. Traffic on Butterfield Road would have no stop sign at this intersection. There would, however, be a stop sign for vehicles intending to turn either left or right from the proposed access road onto Butterfield Road. There would be separate left-turn and right-turn lanes

to exit the development.

¶ 11    The focal point of this litigation is the left-turn movement from the proposed access road onto Butterfield Road during the peak morning weekday hour of 7 to 8 a.m.  KLOA projected that 33 motorists would make this turn during that hour.  The data showed, *inter alia*, a control delay of 248.2 seconds for left-turning motorists, along with a level of service "F," which is the lowest rating (control delay is a figure that is calculated based on an equation specified in the Highway Capacity Manual, and an unsignalized intersection with a control delay exceeding 50 seconds will receive an "F" rating).  An analysis of existing traffic gaps on Butterfield Road showed that there were 81 gaps of sufficient length to theoretically allow up to 135 vehicles to turn left from the proposed access road during the peak morning hour.  Based on this and other data, KLOA determined that motorists who attempted to turn left from the proposed access road onto Butterfield Road would experience long delays but that there were enough gaps in the traffic to accommodate those motorists.

¶ 12    Libertyville relied on its traffic engineer, James Woods, who reviewed the revised application.  Woods expressed reservations about the delays that left-turning motorists would experience as they exited the development during peak hours.  Among his concerns was that motorists facing long wait times with traffic queued up behind them might feel pressured to use less-than-acceptable gaps to turn.  Woods was also concerned that would-be left turners might instead turn right onto Butterfield Road and then either make a U-turn or cut through another subdivision down the road.

¶ 13    Roanoke investigated potential solutions to accommodate Woods' and Libertyville's concerns.  Roanoke considered installing a traffic light at the proposed access road.  Lake County, which has jurisdiction over Butterfield Road, rejected that idea after determining that a traffic light

was not presently warranted there. Roanoke also explored the possibility of (1) installing, at its own expense, a traffic light at Butterfield Road and Lake Street, (2) imposing time-of-day restrictions on left turns from the proposed unsignalized access road onto Butterfield Road, (3) restriping Butterfield Road to allow for two-stage left turns from the proposed access road, and (4) prohibiting U-turns on Butterfield Road. Lake County determined that a traffic light was indeed warranted at Butterfield Road and Lake Street. Nevertheless, the County opposed either restriping Butterfield Road or prohibiting turn movements at the proposed access road during specified times. The County ultimately indicated that it would preliminarily agree to allow unsignalized full access from the proposed access road onto Butterfield Road. The County acknowledged, however, that there would be times of day when movement in and out of the development would be difficult.

¶ 14    Notwithstanding the County's preliminary approval of the access plan, Libertyville continued to voice concerns about the adequacy of the proposed development's means of ingress and egress. On March 21, 2017, Libertyville's Board of Trustees voted to deny all aspects of the revised application, except for the request to amend the Comprehensive Map to designate the remaining seven acres of the subject property as "mixed medium density residential." That reclassified acreage, however, was required to become a conservation area with no structures.

¶ 15    On May 2, 2017, Roanoke terminated its contract to purchase the subject property from the Archdiocese.

¶ 16    On June 19, 2017, the Archdiocese filed a complaint against Libertyville in the circuit court of Lake County. In its prayer for relief, the Archdiocese requested that the court: (1) "Find and declare that the existing zoning of the subject property, IB, is arbitrary, capricious and violates Plaintiff's right to due process under the Illinois Constitution," (2) "Find and declare that Plaintiff's proposed use of the subject property, as set for [*sic*] in its application to the Village ***, is a

reasonable use of the subject property," and (3) "Order the Village to approve a re-zoning of the subject property, a special use permit in the form of a planned development, and all other necessary zoning relief, so as to allow Plaintiff to develop the subject property consistent with the uses and site plan set forth in the application ***."

¶ 17    The matter proceeded to an eight-day bench trial.  The parties introduced voluminous documentary evidence, and the court heard testimony from 15 witnesses. Some witnesses extensively analyzed the data that was reflected in KLOA's traffic impact study, offering competing opinions as to whether such data substantiated Libertyville's concerns.   The Archdiocese also presented evidence that certain traffic simulations—which were not before Libertyville's Board at the time it made its decision—showed that left-turn delays during the morning peak hour would be substantially less than the 248.2 seconds projected by the control-delay calculation.  The Archdiocese's theory was that all of the factors identified in *LaSalle National Bank of Chicago v. County of Cook*, 12 Ill. 2d 40 (1957), and *Sinclair Pipe Line Co. v. Village of Richton Park*, 19 Ill. 2d 370 (1960) (the *LaSalle/Sinclair* factors), weighed in favor of overturning Libertyville's decisions with respect to the revised application.  To that end, the Archdiocese introduced expert testimony that the proposed unsignalized access to the development was safe and appropriate.

¶ 18    Libertyville did not dispute the Archdiocese's arguments with respect to most of the *LaSalle/Sinclair* factors.  According to Libertyville, however, there was a rational basis for its concerns about left turns from the proposed access road onto Butterfield Road.  Woods testified that the safest option would have been a plan that included access through the golf course.  Woods expressed "significant safety concerns" about the proposed single, unsignalized point of access from the development directly onto Butterfield Road.  He believed that such access would not

provide a safe and reasonable means of ingress and egress.

¶ 19    On February 15, 2019, the court issued a 35-page memorandum order ruling in the Archdiocese's favor.  The court determined that the *LaSalle/Sinclair* factors all weighed in favor of the proposed development.  In the court's view, there was "no credible evidence to support the Village's position that the single, unsignalized access point poses any substantial risk to the public health, safety or welfare sufficient to justify the loss of value to the [Archdiocese's] property."  The court determined that Libertyville acted unreasonably and arbitrarily by relying almost entirely on an isolated data point in KLOA's traffic impact study: the control delay of 248.2 seconds.  The court ordered that the development plan accompanying the revised application would be "imposed on the subject property" but would be "subject to reasonable conditions for final approval."  The court noted that such plan "includes a traffic signal at the Lake Street/Butterfield Road/Pine Meadows entrance, subject to the approval of the Lake County Division of Transportation, and the Villages of Mundelein and Libertyville, as appropriate."

¶ 20    Libertyville filed a motion to vacate, reconsider, or modify the memorandum order.  In its motion, Libertyville for the most part restated its closing argument.  At the hearing on that motion, however, Libertyville raised an issue that it had not raised at trial or in its written motion for reconsideration.  Specifically, according to Libertyville, with respect to the Archdiocese's challenge to the denial of the plat of subdivision, the Archdiocese failed to present evidence that the development complied with Libertyville's Subdivision Code.  The court asked Libertyville's counsel how it could consider this issue, given that there was no evidence at trial regarding the requirements of the Subdivision Code.  Libertyville's counsel responded that it was the Archdiocese's burden to present evidence of compliance with the Subdivision Code.  Apart from this brief colloquy between Libertyville's counsel and the court, which encompassed less than two

full pages of the 110-page transcript of the hearing, there was no further discussion or debate of this issue. The court denied Libertyville's motion for reconsideration.

¶ 21    Libertyville timely appealed.

¶ 22                                    II. ANALYSIS

¶ 23    Libertyville challenges the sufficiency of the evidence in two respects. It first argues that it denied the revised application based on valid traffic concerns that were reasonably related to the public health, safety, and morals. With respect to the denial of the preliminary plat of subdivision, Libertyville additionally argues that the Archdiocese failed to prove that either (1) the development plan accompanying the revised application clearly warranted approval as a preliminary subdivision plat or (2) the Subdivision Code is unconstitutional.

¶ 24    In response to Libertyville's first argument, the Archdiocese maintains that the court's judgment was not against the manifest weight of the evidence. As to Libertyville's second point, the Archdiocese argues that Libertyville misconstrues both the nature of the Archdiocese's legal challenge and the court's ruling. The Archdiocese notes that, as a proposed planned development, the plan accompanying the revised application was not required to strictly comply with the Subdivision Code. Nevertheless, the Archdiocese acknowledges that Libertyville may impose reasonable subdivision conditions during its review of the final plat of subdivision.

¶ 25    It is within the province of municipal bodies to determine the uses and purposes to which properties may be devoted. *LaSalle*, 12 Ill. 2d at 46. The courts may not interfere with a municipality's discretion in this regard "unless the legislative action of the municipality is shown to be arbitrary, capricious or unrelated to the public health, safety and morals." *LaSalle*, 12 Ill. 2d at 46. Zoning ordinances are presumptively valid, and a plaintiff who challenges a municipality's decision must rebut this presumption with clear and convincing evidence. *LaSalle*, 12 Ill. 2d at

46. The plaintiff bears the burden of establishing "both the invalidity of the existing zoning ordinance and the reasonableness of the proposed use of the property." *Twigg v. County of Will*, 255 Ill. App. 3d 490, 493 (1994). Where, as here, a plaintiff advances an as-applied challenge to the constitutionality of a municipality's decision, the court applies the rational basis test. See *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 317 (2008). Under that test, the municipality's action will be upheld where such action "bears a rational relationship to a legitimate legislative purpose and is neither arbitrary nor unreasonable." *Napleton*, 229 Ill. 2d at 307.

¶ 26 In *LaSalle*, although the court recognized that each case must be determined on its own facts and circumstances, the court identified six factors that "may be taken into consideration in determining [the] validity of an ordinance": (1) the existing uses and zoning of nearby property, (2) the extent to which property values are diminished by the particular zoning restrictions, (3) the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public, (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner, (5) the suitability of the subject property for the zoned purposes, and (6) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property. *LaSalle*, 12 Ill. 2d at 46-47. In *Sinclair*, the court identified as additional relevant considerations the community's need for the proposed use and the care with which the community has undertaken to plan its land use development. *Sinclair*, 19 Ill. 2d at 378. "No single factor is controlling." *Harris Bank of Hinsdale v. County of Kendall*, 253 Ill. App. 3d 708, 715 (1993).

¶ 27 We may not reverse a decision of the trial court applying the *LaSalle-Sinclair* analysis unless such decision was against the manifest weight of the evidence. *Oliver Construction Co. v. Village of Villa Park*, 257 Ill. App. 3d 750, 753 (1994). A decision is against the manifest weight

of the evidence where the opposite conclusion is "clearly evident." *Harris Bank of Hinsdale*, 253 Ill. App. 3d at 716. In applying this standard, we are mindful that "[t]here is naturally a conflict of testimony in cases of this nature," that "the credibility of witnesses is of great importance," and that the trier of fact is in the best position to make credibility determinations. *LaSalle*, 12 Ill. 2d at 48.

¶ 28    At trial, the Archdiocese introduced evidence addressing all of the *LaSalle/Sinclair* factors. The court determined that each factor weighed in the Archdiocese's favor. On appeal, Libertyville does not dispute that most of the factors weighed in the Archdiocese's favor. For example, there is no dispute that the subject property is suitable for residential development and that the proposed development would have a positive economic impact on Libertyville and its school districts. Indeed, Libertyville represents in its brief that it is "eager" to have the subject property developed. Libertyville nevertheless focuses on *LaSalle* factors three (the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public) and four (the relative gain to the public as compared to the hardship imposed upon the individual property owner). Those two factors are often considered together. *Oliver Construction Co.*, 257 Ill. App. 3d at 755.

¶ 29    Libertyville argues that its decision to deny the revised application was justified by reasonable safety concerns that were related to the unsignalized left turns from the proposed access road onto Butterfield Road during peak hours. Case law indicates that a general increase in traffic attendant to a proposed development is not accorded much weight; a local government may, however, be justified in exercising its zoning powers to minimize potential traffic dangers connected to specific uses of a property. See *Haws v. Village of Hinsdale*, 68 Ill. App. 3d 226, 232 (1979).

¶ 30    The trial court found that Libertyville's concerns as to the adequacy of ingress and egress were insufficient to justify the denial of the revised application.  One of Libertyville's primary concerns was that KLOA's traffic impact study showed a control delay of 248.2 seconds for left turns during the peak morning hour.  The Archdiocese's traffic expert, Luay Aboona, however, explained in detail why he believed that the control delay was not an accurate projection of wait times for left turns at this proposed intersection.  For example, a gap analysis showed that there were more than enough gaps in the existing traffic on Butterfield Road to accommodate the anticipated turns.  Additionally, simulations showed turn delays more in the nature of 67 ½ seconds (if a traffic light were installed down the road at Butterfield Road and Lake Street) or 81 seconds (in the absence of such light).  In Aboona's opinion, wait times for left turns would be "[c]onsiderably less" than 248.2 seconds.

¶ 31    The court accepted Aboona's testimony and found him to be a "much" more credible witness than Libertyville's expert, Woods.  The court was entitled to reach that conclusion.  The mere fact that the evidence was conflicting did not defeat the Archdiocese's claim.  It was instead the role of the trial court to resolve those conflicts. *Van Duyne v. City of Crest Hill*, 136 Ill. App. 3d 920, 924 (1985).  We note that trial testimony showed that the calculated control delay at the existing unsignalized intersection of Butterfield Road and Lake Street was 2,474.9 seconds (about 41 minutes), even though nobody had heard of anybody waiting 41 minutes to make a left turn there.  This further supported Aboona's conclusion that control delay calculations did not reflect actual conditions in connection with Butterfield Road.

¶ 32    There is no question that the level of service would be an "F" for left turns from the proposed access road onto Butterfield Road during peak hours.  Libertyville maintains that this "F" rating was sufficient justification to deny the application.  There was evidence at trial,

however, that the "F" rating did not mean that the proposed intersection was unsafe. Specifically, with respect to an unsignalized intersection, a level of service "F" means only that the control delay exceeds 50 seconds. Aboona explained that, once the traffic on a major street (*i.e.*, Butterfield Road) exceeds 15,000 to 20,000 cars per day, there will automatically be an "F" rating for the minor street approach (*i.e.*, the proposed access road), irrespective of the amount of traffic coming from that minor approach. Approximately 24,000 vehicles travel on Butterfield Road each day. Due to that volume of traffic, even if there were only one projected left-turning vehicle from the proposed access road during the morning peak hour rather than 33, the intersection would receive an "F" rating. Under these circumstances, the court was justified in not giving much weight to the "F" rating.

¶ 33 There was no dispute at trial that motorists would experience at least some delay at certain times of the day if they attempted to make a left turn from the proposed access road onto Butterfield Road. The question for the trial court to consider was whether that delay justified Libertyville's concerns about the adequacy and safety of the proposed development's means of ingress and egress. It may be true, as Libertyville suggests, that motorists generally feel pressured as traffic builds behind them, and that such pressures may alter one's driving behaviors. In the trial court's view, however, Libertyville ignored the fact that motorists turning out of the proposed development would likely be residents of this development who would be "familiar with the traffic patterns and potential for delays in making left turns onto Butterfield Road." That observation was reasonable. We would also note that KLOA's traffic impact study showed a 95th percentile queue length of 81 feet. The evidence showed that, accounting for the space in between cars, one passenger car takes up about 25 feet. Therefore, as Woods acknowledged, 95 percent of the time during the peak morning hour there will be three cars or less in the queue to make a left turn from

the proposed access road onto Butterfield Road. There is thus reason to question the extent to which traffic will build up behind left-turning motorists and create a situation where motorists feel pressured to make unsafe traffic maneuvers.

¶ 34    The court was also entitled to consider that the proposed unsignalized point of access to the development met Lake County's standards. Paula Trigg, a County representative, testified that the best and safest option would have been to have a signalized access to the development at Lake Street—*i.e.*, via the proposed secondary point of access that was identified in the original application. Nevertheless, she believed that unsignalized access from the proposed access road onto Butterfield Road was "safe and effective."

¶ 35    At trial, Libertyville repeatedly emphasized that the original application included a secondary access. Libertyville also elicited testimony that Roanoke asserted in the original application that a signalized secondary access would "improve traffic conditions appreciably." In its memorandum decision, the court said the following about the proposed secondary access:

> "The court does not believe that the fact that a second access point at Pine Meadow Lane was in the initial proposed development plan but later withdrawn by the Plaintiff and its developer is at all relevant to the issues the court must decide. Many possible alternative designs might be better and safer than the proposal finally submitted. The issue is not whether there could have been a better design; the only issue for the court to decide is whether denial by the village of the finally submitted design is arbitrary and unreasonable."

The court's rationale on this point was reasonable, especially given that the evidence showed that a second access point through the golf course may have been unfeasible for multiple reasons. As explained above, the evidence also supported a conclusion that the single, unsignalized point of access to the proposed development was safe and adequate.

¶ 36    Libertyville mentions in its brief that it was entitled to "protect the public and stop a bad intersection from becoming worse."  It is not clear what Libertyville is arguing here.  The intersection at Butterfield Road and the proposed access road has not been built yet, so we assume that Libertyville is not talking about that intersection.  Perhaps Libertyville is referencing the existing unsignalized intersection at Butterfield Road and Lake Street. As part of the revised application, however, Roanoke committed itself to paying for a traffic light at that intersection. The evidence showed that such light was warranted and would ameliorate an existing traffic problem on Butterfield Road.

¶ 37    The record shows that the court thoughtfully addressed the voluminous evidence presented at trial and weighed the credibility of the witnesses.  In doing so, the court considered Libertyville's concerns in light of the benefits that the proposed development would indisputably bring to the community.  The court ultimately determined that Libertyville's concerns did not justify its decisions with respect to the revised application.  Consequently, we cannot say that the court's conclusions were against the manifest weight of the evidence.

¶ 38    In its second issue on appeal, Libertyville focuses on its decision to deny a preliminary plat of subdivision.  Libertyville contends that the court's memorandum order effectively awarded *mandamus* relief to the Archdiocese.  According to Libertyville, such relief was unwarranted, because the Archdiocese failed to prove that either (1) the development plan accompanying the revised application clearly warranted approval as a preliminary subdivision plat or (2) the Subdivision Code is unconstitutional.  Libertyville maintains that, to the contrary, the proposal failed to comply with certain requirements of the Subdivision Code.

¶ 39    This issue is forfeited.  If Libertyville believed that noncompliance with the Subdivision Code justified its decisions to deny any or all requests that accompanied the revised application,

Libertyville was free to present such a defense at trial. Instead, at trial, both Libertyville and the Archdiocese treated Libertyville's decisions with respect to the revised application as a package deal that was denied because of concerns as to the adequacy of ingress and egress.

¶ 40    Libertyville's counsel also made it clear during his closing argument that Libertyville's sole objection to the revised application was that the plan did not provide an adequate means of ingress and egress. For example, counsel explained: "When the village denied this particular set of application [*sic*], when it denied this particular development, it did so because it reasonably determined that access, in particular egress[,] was not adequate and because you [*sic*] considered an adverse impact upon public safety." Later during Libertyville's closing argument, the court interjected: "The sole issue I am hearing about of the village concern is the access." Libertyville's counsel responded: "I agree. I agree with you, yes. I do agree." We take counsel's remarks as a judicial admission that noncompliance with the Subdivision Code was not a factor in Libertyville's decisions with respect to the revised application. See *In re Estate of Rennick*, 181 Ill. 2d 395, 406 (1998) ("Judicial admissions are defined as deliberate, clear, unequivocal statements by a party about a concrete fact within that party's knowledge."); *Lowe v. Kang*, 167 Ill. App. 3d 772, 777 (1988) (holding that an attorney's remarks during closing argument can constitute a judicial admission).

¶ 41    It was not until the hearing on Libertyville's motion for reconsideration that Libertyville's counsel briefly mentioned that the Archdiocese failed to prove that the plan complied with the Subdivision Code. Such argument was untimely. See *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 36 ("Arguments raised for the first time in a motion for reconsideration in the circuit court are forfeited on appeal."). Moreover, Libertyville's counsel did not direct the court's attention at that time to any provisions of the Subdivision Code that Libertyville believed applied.

Nor did Libertyville's counsel argue that the Archdiocese failed to prove that the Subdivision Code was unconstitutional. Given the perfunctory nature of Libertyville's arguments on a point that it raised for the first time orally at the hearing on the motion for reconsideration, the court understandably made no findings with respect to the development plan's compliance with the Subdivision Code.

¶ 42   This case is distinguishable from *First National Bank of Joliet v. County of Grundy*, 197 Ill. App. 3d 660 (1990), and other cases that Libertyville cites. In *First National Bank of Joliet*, for example, the governing authority denied the plaintiff's application for a preliminary plat of subdivision expressly due to noncompliance with applicable subdivision regulations. *First National Bank of Joliet*, 197 Ill. App. 3d at 662-64. Libertyville cites no case where a municipal body offered one justification for its decisions in the trial court, lost the case, and then successfully provided a new justification on appeal.

¶ 43   On top of the forfeiture, Libertyville's new arguments are barred by the invited-error doctrine. Libertyville maintains that the *LaSalle-Sinclair* factors "have no application to subdivision regulations." Such contention directly contradicts what Libertyville argued at trial, as Libertyville invited the court to decide the case by reference to the *LaSalle-Sinclair* factors. "A party cannot complain of error which he induced the court to make or to which he consented." *McMath v. Katholi*, 191 Ill. 2d 251, 255 (2000).

¶ 44   For all of these reasons, we will not address the merits of the second issue that Libertyville raises. Though framed as a sufficiency-of-the-evidence challenge, Libertyville's argument is a transparent attempt to manufacture a new defense on appeal that is inconsistent with what it argued at trial.

¶ 45                    III. CONCLUSION

- 16 -

¶ 46    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 47    Affirmed.